# **EXHIBIT A**

Westlaw.

Not Reported in F.Supp.  
1995 WL 138545 (N.D.Cal.)

**(Cite as: 1995 WL 138545 (N.D.Cal.))**

H  
Only the Westlaw citation is currently available.

United States District Court, N.D. California.  
R.E. SERVICE CO., INC., a California corporation,  
Plaintiff,  
v.  
JOHNSON & JOHNSTON ASSOCIATES, INC., a  
New Hampshire corporation, Defendants.  
JOHNSON & JOHNSTON ASSOCIATES, INC., a  
New Hampshire corporation,  
Counterclaimant,  
v.  
R.E. SERVICE CO., INC., a California corporation  
and Mark Frater, an  
individual, Counterdefendants.  
**C 92-20672 RPA/PVT.**

March 27, 1995.  
David Slaby, Ken Kaslow, Fenwick & West, Palo Alto, CA.

Fay E. Morisseau, M. Patricia Thayer, Matthew Weil, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, A Professional Corporation, San Francisco, CA.

John L. Dupre, Richard A. Wise, Hamilton, Brook, Smith & Reynolds, P.C., Lexington, MA.

*ORDER DENYING MOTION TO RECONSIDER ORDER MODIFYING INJUNCTION AND MOTION TO STAY DAMAGES PHASE OF TRIAL AND MONETARY DAMAGES AWARDED IN ORDER FINDING RES IN CONTEMPT*

AGUILAR, District Judge.

*1 Defendants, by way of motion, seek reconsideration of the portion of the court's Order re Post-Trial Motions of January 26, 1995, amending the prohibitory injunction. Both R.E. Service Co., Inc. ("RES") and Mark Frater request that the court reconsider its ruling granting Johnson & Johnston Associates, Inc.'s ("JJA") Motion to Amend the judgment. In this ruling, the court changed the injunction which first prohibited a product made with a band of adhesive which formed a "continuous seal." Now the injunction prohibits the making of a product which forms a "substantially continuous band."

Further, RES and Frater seek an order entering a stay of both the damages phase of the trial and the monetary aspects of the contempt order this court entered on January 25, 1995. RES and Frater seek a stay pending appellate review.

The court has taken the motions under submission without hearing oral argument from the parties. Having considered all papers and good cause appearing, the court denies RES' and Frater's motions in their entirety.

*FACTUAL BACKGROUND*  
As was set forth in this court's prior order, this case arises out of a patent dispute. Both RES and JJA claim to have been the first to invent a process for facilitating the manufacture of printed circuit boards ("PCB").

RES brought this declaratory judgment action seeking a determination that RES's AC3 and AC2 products did not infringe United States Patent No. 5,153,050 (the " '050 patent"). RES also sought a declaration that the '050 patent held by JJA was invalid. JJA counterclaimed against RES for patent infringement, and against its president, Frater, for inducement to infringe. JJA further alleged that defendants had acted in wilful disregard of JJA's rights under the '050 patent.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 2
1995 WL 138545 (N.D.Cal.)

**(Cite as: 1995 WL 138545 (N.D.Cal.))**

The court bifurcated the issue of damages in pretrial proceedings. The jury trial on the issues of liability and wilfulness began on June 24, 1994. Closing arguments were heard on July 12, 1994. After the presentation of evidence, the parties made a variety of Federal Rules of Civil Procedure 50(a) motions for judgment as a matter of law. At that time the court denied the motions and the case went to the jury.

On July 14, 1994, after a day of deliberations, the jury rendered a verdict against RES and Frater. The jury found that the '050 patent was valid. The jury found that RES had infringed claims 1, 2, and 7 of the patent by making or selling its AC3 and AC2 products. The jury also found that Frater had induced such infringement. The jury declined, however, to enter a verdict of wilfulness against either defendant.

On July 29, 1994, the court signed a partial judgment based on the jury's verdict. The partial judgment was entered on August 4, 1994. All post trial motions were filed within the time limit set by the Federal Rules. *See* Fed.R.Civ.P. 6 and 59. Good cause appearing, on January 25, 1995, the court entered its "Order Re Post Trial Motions." The court found that both Frater and RES were guilty of wilful infringement. The court granted JJA's motion for judgment as a matter of law as to the wilfulness issue.

*2 In keeping with the jury's findings, the court further broadened the language of its injunction. The court chose to follow the language contained in Jury Instructions No. 15.

Specifically, the court altered paragraph four of the injunction. The court also named Frater, personally, in the injunction.

The new paragraph four of the injunction contained in the partial judgment now reads:
R.E. Service and its officers, directors, employees, agents, representatives, successors and assigns, in their official capacity with R.E. Service, are permanently enjoined from making, using or selling a laminate constructed of a sheet of copper foil and a sheet of aluminum, one surface of each of the copper sheet and the aluminum sheet being essentially uncontaminated and engageable with each other at an interface, and a band of flexible adhesive which forms a substantially continuous band joining the uncontaminated surfaces together at their borders and defining a substantially uncontaminated central zone inwardly of the edges of the sheets.
Mark Frater is specifically enjoined from inducing the above described acts.

*LEGAL ANALYSIS*
*1. Reconsideration of the order*

Ninth Circuit law permits motions for reconsideration in the following situations:
"A motion for reconsideration must do two things. First, it must demonstrate some reason why the court should reconsider its prior position. Second, it must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision. Courts have distilled three major grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice."
*All Hawaii Tours Corp. v. Polynesian Cultural Center,* 116 F.R.D. 645, 648 (D.Hawaii, 1977), reversed in part on other grounds, 855 F.2d 860.

These strict limitations on the reconsideration of motions ensure judicial economy and encourage finality in the progress of litigation.

In applying the three-pronged test set forth in *All Hawaii,* the court finds that RES and Frater have not met their burden.

First, the motion to reconsider raises the same legal issues as does their previous submissions to the court.

Second, RES and Frater have failed to mention any new facts relevant to the issues raised in the prior motion. Thus, no new evidence has been provided to the court that would make a motion to reconsider appropriate.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1995 WL 138545 (N.D.Cal.)

**(Cite as: 1995 WL 138545 (N.D.Cal.))**

Page 3

Third, RES and Frater have not shown that the prior order was clear error. Nor have the moving parties shown that the prior order caused manifest injustice to any of the parties. RES and Frater have merely repeated arguments articulated in their prior opposition to the Motion to Find Wilfulness as a Matter of Law and the Motion to Amend Judgment.

In their papers, RES and Frater (hereinafter, for purposes of this order "RES") cite no new facts or legal issues. RES claims that this court's prior order should be reconsidered to correct clear error or prevent manifest injustice. RES then reiterates the arguments that the court has already considered and discussed in rendering its prior decision in this matter. The parties have all previously and thoroughly addressed issues relating to the language of the injunction. RES' argument is that the prohibitory injunction is vague and confusing. The parties and the court have previously thoroughly discussed this allegedly vague language. The court held a three hour Order to Show Cause Re Contempt Hearing on an alleged violation of the court's first injunction. At this hearing, the parties presented much argument and briefing on the correct interpretation of the injunctive language. All parties attended and participated in this evidentiary hearing. The arguments which RES raises in its Motion to Reconsider are mere repetitions of prior arguments.

*3 The court finds that RES has not (1) cited any intervening change in the law; (2) set forth any new facts; nor (3) shown any clear error made by the court or any manifest injustice caused by the prior order. RES has failed to articulate any basis for this court to reconsider its prior ruling.

The court denies the Motion to Reconsider.

*2. Motion to Stay.*

RES requests this court to stay (1) the damages phase of the trial and (2) the monetary aspects of the contempt order pending RES' appeals.

The court first will address the proposed stay of the damages phase of the trial first.

RES relies on *Landis v. North American Co.* 299 U.S. 248, 254 (1936) for the proposition that "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis,* however, concerns a stay pending a simple accounting.

The *Landis* court held that a stay pending an accounting may be useful. This is not always true as can be seen in *Icyclair, Inc. v. Dist. Co.,* 93 F.2d 625 (9th Cir.1937). The *Icyclair* case also involved an accounting action. The court, however, allowed the accounting to proceed simultaneously with an appeal of a determination on patent validity. Neither case is directly on point, however, because the second phase of the trial involves much more than a simple accounting. Rather, the second phase of the trial at bar will involve a full determination of damages.

After citing *Landis, supra,* RES failed to make a showing that a stay is merited for reasons other than a pending accounting. A court has the discretion to stay or not stay proceedings pending before it. In fact, however, a stay of the damages phase of a patent trial is the exception rather than the rule. *See* Federal Rule of Civil Procedure 62(a). A stay will only be granted upon a proper showing that it will not harm the non-moving party. Where there is a "fair possibility" that the stay will damage the other party, the party seeking the stay must demonstrate a "clear case of hardship or inequity" to obtain a stay. *Landis, supra.* at 255.

The Ninth Circuit has directed that, before granting a stay, the district court must weigh the "competing interests" to be affected. In addition to considering the "possible damage which may result from the granting of a stay," the court should also consider the "hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *Filtrol Corp. v. Kelleher* 467 F.2d 242 (9th Cir.1972), *cert. denied,* 409 U.S. 1110,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                             Page 4
1995 WL 138545 (N.D.Cal.)
**(Cite as: 1995 WL 138545 (N.D.Cal.))**

(1973). RES has not pointed to any harm which might result from going forward with the case. RES has not made out the "clear case of hardship or inequity" required under *Landis, supra.* In the case at hand, there is more than a "fair possibility" that a stay would prejudice JJA. The court adjudged RES to be a wilful infringer. The court ordered RES to discontinue the sale of infringing product. Yet, RES wilfully disregarded that order. The court found RES to be in contempt of this Court's first prohibitory injunction.

*4 In contrast, it appears that a stay could substantially harm JJA. If the court were to grant a stay, RES could potentially fold its business or transfer its remaining assets so as to become judgment proof. Furthermore, the length of time to appeal this matter would require a lengthy stay. JJA would be unduly harmed by such a long delay. JJA is now entitled to compensation for RES' patent infringement and to the fines awarded in the contempt proceeding. Any delay of this compensation is not merited.

In addition to the above reasons, even if the Federal Circuit reversed this court's judgment, the most RES can hope to achieve is a new trial. RES has no way of obtaining an outright victory in the Court of Appeals. RES is not seeking a judgment as a matter of law at the appellate level. In any new trial that might take place, damages will be determined along with liability.

RES primarily argues that needless time and money would be expended if the court should proceed with this case only to have the liability judgment overturned on appeal.

This court, however, did not make its decision on the Post Trial Motions lightly. Only after much careful consideration and research, did it determine that RES and Frater wilfully infringed JJA's patent.

The court finds that delaying the damages phase of the trial would merely prevent JJA from receiving the damages to which JJA is entitled without good cause.

The court will now address RES' request for stay of the monetary aspects of the court's January 25, 1995 Order in re Contempt.

The Supreme Court has identified four factors to be considered when determining whether a court should stay an order pending appeal:
  (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits;
  (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceedings; and (4) where the public interest lies.
*Hilton v. Braunskill,* 481 U.S. 770, 776 (1987).

The application of all four of these factors to this case mitigate against the stay that RES seeks. RES has made no showing of likelihood of success on the merits. The evidence of willful contempt of the court's injunction is plain to this court. The court made a fact-based determination. The Court of Appeal is less apt to reverse such a factual determination. Further, the likelihood of harm to RES is slim. Even if RES does obtain a reversal of the Order re Contempt, RES can be made whole by JJA's repayment of the monetary damages. It is clear that JJA is financially able to do this.

On the other hand, RES' payment of the contempt fines to JJA would serve the public interest. The policy behind the patent statute which this court is enforcing, is best served by denying the stay. The court needs to demonstrate to RES and all adjudged infringers that contempt proceedings are serious. Wilful contempt of a court's specific injunction against continued infringement will be remedied swiftly by the imposition of monetary sanctions.

*CONCLUSION*
*5 The court denies defendants' Motion to Reconsider and defendant's Motion For Stay in their entirety.

IT IS SO ORDERED.

1995 WL 138545 (N.D.Cal.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1995 WL 138545 (N.D.Cal.)  
**(Cite as: 1995 WL 138545 (N.D.Cal.))**

Page 5

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CORDIS CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ADVANCED CARDIOVASCULAR ) | |
| SYSTEMS, INC., GUIDANT CORPORATION, ) | |
| MEDTRONIC AVE, INC., ) | |
| BOSTON SCIENTIFIC CORPORATION, and ) | |
| SCIMED LIFE SYSTEMS, INC., ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | Civ. No. 97-550-SLR |
| ) | (Consolidated) |
| ADVANCED CARDIOVASCULAR ) | |
| SYSTEMS, INC. ) | |
| ) | |
| Counterclaim Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| CORDIS CORPORATION and ) | |
| EXPANDABLE GRAFTS PARTNERSHIP, ) | |
| ) | |
| Counterclaim Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| BOSTON SCIENTIFIC CORPORATION, and ) | |
| SCIMED LIFE SYSTEMS, INC., ) | |
| ) | |
| Counterclaim Plaintiffs, ) | |
| ) | |
| and ) | |
| ) | |
| MEDTRONIC AVE, INC., ) | |
| ) | |
| Counterclaim Plaintiff, ) | |

|  |  |  |
|---|---|---|
| v. | ) | |
| | ) | |
| CORDIS CORPORATION, JOHNSON & | ) | |
| JOHNSON, and EXPANDABLE GRAFTS | ) | |
| PARTNERSHIP, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |
| | ) | |
| MEDTRONIC AVE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 97-700-SLR |
| | ) | |
| CORDIS CORPORATION, JOHNSON & | ) | |
| JOHNSON, and EXPANDABLE GRAFTS | ) | |
| PARTNERSHIP, | ) | |
| | ) | |
| Defendants. | ) | |
| | | |
| BOSTON SCIENTIFIC CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 98-19-SLR |
| | ) | |
| v. | ) | |
| | ) | |
| ETHICON, INC.; CORDIS CORPORATION; | ) | |
| and JOHNSON & JOHNSON | ) | |
| INTERVENTIONAL SYSTEMS CO., | ) | |
| | ) | |
| Defendants. | ) | |

**EXPERT REPORT OF DAVID C. CUMBERLAND, M.D.**

At the request of counsel for defendants Boston Scientific Corporation and SCIMED Life Systems, Inc., I hereby submit this report pursuant to Fed. R. Civ. P. 26(a)(2)(B).

- 2 -

manufacturers and enter into consulting agreements with medical device manufacturers. Interventional physicians who teach at medical schools develop cooperative research relationships with academics at engineering schools. In the course of these relationships, a design concept for a device can originate either from the physicians or the engineers, but each group needs the other to develop the design to the stage of performing clinical trials.

### C.  Obviousness of Claims 23, 44, 51 and 52 of the '762 Patent[1]

---

[1] The text of those claims (including claim 13, on which claim 23 depends) reads as follows:

13.  An expandable intraluminal vascular graft, comprising:

>   a thin-walled tubular member having first and second ends and a wall surface disposed between the first and second ends, the wall surface having a substantially uniform thickness and a plurality of slots formed therein, the slots being disposed substantially parallel to the longitudinal axis of the tubular member;
>
>   the tubular member having a first diameter which permits intraluminal delivery of the tubular member into a body passageway having a lumen; and
>
>   the tubular member having a second, expanded and deformed diameter, upon the application from the interior of the tubular member of a radially, outwardly extending force, which second diameter is variable and dependent upon the amount of force applied to the tubular member, whereby the tubular member may be expanded and deformed to expand the lumen of the body passageway.

23.  The expandable intraluminal vascular graft of claim 13, wherein the outside of the wall surface of the tubular member is a smooth surface, when the tubular member has the first diameter.

44.  A method for implanting a balloon expandable stent prosthesis within a passageway of a coronary artery having an area of stenosis, comprising the steps of:

>   utilizing a thin-walled, tubular member as the stent prosthesis, the tubular member having a plurality of slots formed therein, the slots being disposed substantially parallel to the longitudinal axis of the tubular member;
>
>   disposing the stent prosthesis upon a catheter having an inflatable balloon portion;
>
>   inserting the stent prosthesis and catheter within the passageway by percutaneous catheterization;
>
>   delivering the catheter and stent prosthesis to the area of stenosis without surgically exposing the area of the passageway; and
>
>   expanding and deforming the stent prosthesis at the area of stenosis within the coronary artery passageway by expanding the inflatable balloon portion of the catheter associated with the stent prosthesis to force the stent prosthesis radially outwardly into contact with the area of stenosis in

(continued...)

### 1. *1984 Palmaz Abstract and the Wallsten Patent*

66.    The 1984 Palmaz Abstract (Tab 23) describes a tubular mesh device to provide support and prevent recoil and restenosis following angioplasty. It is apparent that the mesh is balloon-expandable, rather than self-expanding, given the description that the tubular mesh has "soldered cross points," which precludes a self-expanding tubular mesh, such as that described in the Wallsten patent (Tab 24).[2] Moreover, the balloon-expanded tubular mesh is necessarily plastically deformed by the balloon, since the expanded tubular mesh is to function as "a supportive endoprosthesis to prevent recoil of the arterial wall." Thus, the 1984 Palmaz Abstract teaches the

---

[1](...continued)
the passageway, the stent prosthesis being controllably deformed beyond its elastic limit.

51.    In combination, a balloon expandable stent prosthesis for implantation in the passageway of a coronary artery having an area of stenosis and a catheter, comprising:

> an expandable stent prosthesis being a thin-walled tubular member having first and second ends and a wall having an outer wall surface disposed between the first and second ends, the wall having a substantially uniform thickness and a pluratity of slots formed therein, the slots being disposed substantially parallel to the longitudinal axis of the tubular member;
>
> a catheter having an expandable, inflatable balloon portion;
>
> the tubular member being disposed on the balloon portion of the catheter;
>
> the tubular member having a first diameter which permits intraluminal delivery of the tubular member and the catheter into a lumen of a coronary artery having an area of stenosis and wherein the outside of the wall surface of the tubular member is a smooth surface when the tubular member has the first diameter: and
>
> the tubular member having a second, expanded and deformed diameter upon the application from the interior of the tubular member of radially, outwardly extending force, by inflating the balloon portion of the catheter, which second diameter is variable and controlled by the amount of force applied to the tubular member, whereby the tubular member may be expanded and deformed to expand the coronary artery in the area of stenosis.

52.    The combination of claim 51, wherein at least certain of the slots are defined by a pair of spaced apart elongate members that are connected togther at one end of each of the elongate members so as to define an open ended slot.

---

[2] I am aware that during the reexamination of the parent '665 patent the Examiner took a different view, but he may have misunderstood the nature of the welding described in the Wallsten patent.

- 29 -

basic concept of a balloon-expandable stent, which is: (1) delivered to the treatment site by balloon catheter in a smaller, unexpanded state, (2) expanded by the balloon's application of a force to the interior of the stent, plastically deforming it to a larger, expanded diameter, and (3) leaving the deformed stent in the body in order to support the treatment site. In addition, the 1984 Palmaz Abstract discloses in some detail the structure of a balloon expandable stent like that shown in the '665 patent. While the 1984 Palmaz Abstract does not contain any illustration, a person of ordinary skill in the art with the Wallsten patent before him would have no trouble understanding the nature of the tubular mesh design. The Wallsten patent illustrates an example of a tubular mesh in the very same field of stents.

67. I do not believe that the typographical errors that appear in the published 1984 Palmaz Abstract would have prevented a person of ordinary skill in the art from understanding the device described. Specifically, the description of the grafts as "six, eight, and 10 ml in diameter by 20 ml in length" would have readily been understood as describing those dimensions in millimeters. In addition, I understand that the reference to the graft's wall thickness as "20-45 microns" is an error, and that the true approximate thickness of the grafts described was 200-450 microns. It is my opinion nonetheless that a person of ordinary skill in the art would have understood the structure of the graft described.

68. I believe that a number of things would have been readily apparent about such a device at the time. First, even though wire might be of uniform cross-section, at the points where the wire intersected there would be a double thickness. In fact, the thickness might be slightly more than double by virtue of the solder or other material used to fix the wires together. Such double thickness would be likely to produce an irregular surface on implantation, which in turn would be likely to cause turbulent blood flow around the wires. Interference with blood flow is something that one

would have been concerned would cause platelet aggregation and thrombosis. This phenomenon was well known from experience of blood flow over guidewires and was known to be liable to cause thrombosis.

69. Second, I believe that one would have a concern using a second metal to secure the wires together. Even small electrolytic effects were thought to be a potential cause of thrombosis.

70. Third, I would be very concerned that any possibility of failure at a joint upon expansion of the device might lead to weakening of the structure and/or damage to the balloon. I would be concerned that a structure involving cross-wires secured in this way might fail at least at some points on expansion at high pressure in the artery.

71. In the light of these matters I believe that by looking at such a structure involving cross wires it would be readily apparent that a potential way of dealing with my concerns would be to make the device in a one piece manner out of a slotted tube. This would enable the benefits of the device to be retained while avoiding the double thickness and other problems referred to above. Such a one-piece device would be capable of variable expansion, depending on the final diameter of the expanded balloon.

72. I am reinforced in my view having read the article by Dr. Palmaz and Dr. Reuter published in the Handbook of the Eighth International Course of Peripheral Vascular Intervention, a copy of which article is at Tab 14. In that article Dr. Palmaz states that the wire design was intended only for study purposes and that the slotted tube device made from one single piece of material was "apt for prosthetic implantation" and the next "iteration" from the wire mesh design.

2. *Ersek*

73. One such example of a once-piece wire-mesh-type design is described in the Ersek

- 31 -

mesh graft, and provide diagrams of that wire mesh tube.

D.  *Obviousness of Claims 17, 18, 25 and 26 of the '417 Patent*[4]

1.  *1985 Palmaz Article and Earlier Palmaz Patents*

---

[4] The text of those claims reads as follows:

17. A method for expanding the lumen of a body passageway comprising the steps of:

connecting a plurality of intraluminal grafts by at least one flexible connector member disposed between adjacent grafts;

inserting the plurality of connected intraluminal grafts, disposed upon a catheter, into the body passageway until the grafts are disposed adjacent a desired location within the body passageway; and

expanding a portion of the catheter to provide controllable expansion of the intraluminal grafts radially, outwardly into contact with the body passageway, by deforming a portion of the intraluminal grafts with a force in excess of the elastic limit of the portion of the intraluminal grafts, until the lumen of the body passageway at the desired location in the body passageway has been expanded, whereby the intraluminal grafts prevent the body passageway from collapsing and decreasing the size of the expanded lumen, and the intraluminal rafts remain in the passageway.

18. The method of claim 17, including the step of disposing the at least one connector member in a non-parallel relationship with respect to the longitudinal axis of the intraluminal grafts.

25. An expandable intraluminal vascular graft, comprising:

a plurality of thin-walled tubular members, each having first and second ends and a wall surface disposed between the first and second ends, the wall surface having a substantially uniform thickness and a plurality of slots formed therein, the slots being disposed substantially parallel to the longitudinal axis of each tubular member;

at least one connector member being disposed between adjacent tubular members to flexibly connect adjacent tubular members;

each tubular member having a first diameter which permits intraluminal delivery of the tubular members into a body passageway having a lumen; and

the tubular members having a second, expanded and deformed diameter, upon the application from the interior of the tubular members of a radially, outwardly extending force, which second diameter is variable and dependent upon the amount of force applied to the tubular members, whereby the tubular members may be expanded and deformed to expand the lumen of the body passageway.

26. The expandable intraluminal graft of claim 25, wherein at least one connector member is disposed in a non-parallel relationship with respect to the longitudinal axis of the tubular members.