# EXHIBIT A

Not Reported in F.Supp.
1994 WL 808421 (C.D.Cal.)
(Cite as: 1994 WL 808421 (C.D.Cal.))

**H**

Page 1

Only the Westlaw citation is currently available.

United States District Court,
C.D. California.
MAGNESYSTEMS, INC., Plaintiff,
v.
NIKKEN, INC., and Nu-Magnetics, Inc., Defendants.
NIKKEN, INC., and Nu-Magnetics, Inc.
Counterclaimants,
v.
MAGNESYSTEMS, INC., Counter-Defendants.
CV 94-0715-ABC(EEX).

Aug. 8, 1994.

COLLINS, District Judge.

*1 Plaintiff's Motion for Permanent Injunction and Motion for Amendment of Judgment Providing for Entry of Permanent Injunction and Defendants' Motion for Stay of Discovery and Other Proceedings Pending Outcome of Appeal and Cross-Motion for Stay of Injunction Pending Appeal and/or Stay of Proceedings Pending Outcome of Reexamination Proceedings came on regularly for hearing before this Court on August 8, 1994. After reviewing the materials submitted by the parties, argument of counsel, and the case file, it is hereby ORDERED that Plaintiff Magnesystems' Motion for Amendment of Judgment Providing for Entry of Permanent Injunction is GRANTED; Defendants Nikken and Nu-Magnetics' Motion for Stay is GRANTED as to Discovery only, and DENIED as to All Other Proceedings; and Defendants Nikken and Nu-Magnetics' Cross-Motion for Stay of Injunction Pending Appeal and/or Stay of Proceedings Pending Outcome of Reexamination Proceedings is DENIED. Additionally, the Court hereby ORDERS incorporated into this Order Plaintiff's Proposed Order Re: Amendment to Judgment To Add Permanent Injunction. Finally, because the granting of Plaintiff Magnesystems' Motion for Amendment of Judgment Providing for Entry of Permanent Injunction renders Plaintiff Magnesystems' Motion for Permanent Injunction moot, the Court hereby ORDERS that Plaintiff Magnesystems' Motion for Permanent Injunction is DENIED.

I. Background
A. Facts

Plaintiff MAGNESYSTEMS, INC, ("Magnesystems") is the owner of all rights and interest in United States Letters Patent No. 4,489,711 ("patent '711"). Patent '711 was issued to inventor Arno W. Latzke for "magnetic plaster". Magnetic plaster is a magnetized, elastic sheet, often self-adhesive, which, when applied to a person's skin, can be therapeutic.

In its Complaint, Magnesystems alleges that Defendants NIKKEN, INC. and NU-MAGNETICS, INC. (hereinafter collectively as "Nikken") made, used, and sold, without a license from Magnesystems, a line of flexible magnetic sheet products that infringe upon patent '711. Nikken asserts that its product does not infringe patent '711, or, in the alternative, that patent '711 is invalid.

B. Procedural History

Magnesystems filed its Complaint on February 1, 1994. On February 23, 1994, Nikken filed an Answer. Nikken filed a motion for summary judgment on May 3, 1994 and Magnesystems filed a cross-motion for summary judgment on May 9, 1994. This Court heard the motions on June 13, 1994, and on the same date filed its Order denying Nikken's motion for summary judgment and granting Magnesystems' cross-motion for summary judgment (hereinafter "Order"). The Order was entered on June 16, 1994.

On June 23, 1994, Nikken filed a Notice of Appeal in District Court, pursuant to Federal Rule of Appellate Procedure 4(a)(1), announcing that it was appealing the Order to the United States Court of Appeals for the Federal Circuit under 28 U.S.C. § 1292(c)(2). On June 24, 1994, Magnesystems filed a motion for a permanent injunction. On the same date, Nikken filed a motion for a stay of discovery and other proceedings pending the outcome on appeal. On June 30, 1994, Magnesystems filed a motion for an amendment to the judgment of June 16, 1994 to provide for the entry of a permanent injunction. On July 5, 1994, Nikken filed a request for reexamination of the '711 patent with the Patent Trademark Office ("PTO"). On July 11, 1994, Nikken filed a cross-motion for stay of any injunction pending appeal and/or stay of proceedings in district court pending outcome of reexamination proceedings. Both parties have filed the appropriate opposition and reply papers.

II. Discussion
A. This Court Has Jurisdiction to Consider Plaintiff's Motion to Amend Judgment.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*2** Magnesystems has moved for a permanent injunction and an amendment to the judgment of June 16, 1994 to provide for the entry of a permanent injunction. Nikken asserts two reasons why this Court is without jurisdiction to either grant a permanent injunction or amend its Order of June 16, 1994. First, the Order is not a "judgment" under Federal Rule of Civil Procedure 59(e), but is an interlocutory order. (Defendants' Cross-Motion For Stay of Any Injunction Pending Appeal and/or Stay of Proceedings in District Court Pending Outcome of Reexamination Proceedings (hereinafter "Defs.' X-Mo.") at 19:18-19.) Second, Nikken's filing of a Notice of Appeal on June 23, 1994 divested this Court of jurisdiction over Magnesystems' motions. Because this Court finds that it has jurisdiction over Plaintiff's motion to amend judgment, it does not consider whether it has jurisdiction over Plaintiff's motion for permanent injunction.

*1. The Order Is A "Judgment" Under Federal Rule of Civil Procedure 59.*

Nikken asserts that because Rule 59 is limited to the amendment of ""judgments", Magnesystems cannot seek amendment of any judgment under Rule 59(e) because no "judgment" yet exists to be amended. (Defs.' X-Mo. at 20:8- 12.) Nikken, however, defines "judgment" too narrowly. The definition of the term "judgment" as that term is used in the Federal Rules of Civil Procedure is controlled by Federal Rule of Civil Procedure 54(a). Rule 54(a) provides:

(a) Definition; Form. "Judgment" as used in these rules includes a decree and *any order from which an appeal lies.*

Fed. R. Civ. Proc. 54(a) (emphasis added).

On June 23, 1994, Nikken filed a Notice of Appeal of the Order pursuant to 28 U.S.C. § 1292(c)(2) with the United States Court of Appeals for the Federal Circuit. Assuming, without deciding, that Nikken's Notice of Appeal is effective, the Order is an "order from which an appeal lies." Therefore, the Order is a "judgment" as that term is defined in Federal Rule of Civil Procedure 54(a).

Federal Rule of Civil Procedure 59(e) provides that a party may move "to alter or amend the judgment not later than ten days after entry of judgment." [FN1] Federal Rule of Civil Procedure 54(a) governs the meaning of the word ""judgment" in Rule 59(e). 10 Charles A. Wright *et al., Federal Practice and Procedure,* § 2651 (1983). Therefore, as the Order is one from which an appeal lies, it may be amended pursuant to Rule 59(e).

*Mendenhall v. Barber-Greene Co.,* 31 U.S.P.Q.2d 1001 (Fed. Cir. 1994) is not to the contrary. *Mendenhall* simply states that the judgment of a district court as to patent validity and infringement is not a *final judgment* under Federal Rule of Civil Procedure 60(b). *Id.* at 1006 (emphasis added). However, a "final judgment" under Federal Rule of Civil Procedure 60(b) is narrower than a "judgment" under Federal Rules of Civil Procedure 54(a) and 59(e). A "final judgment" is one that "ends the litigation on the merits and leaves nothing for the court to do but execute judgment." *Catlin v. United States,* 324 U.S. 229, 233 (1945). However, a "judgment" under Rules 54(a) and 59(e) "includes ... any order from which an appeal lies." Fed. R. Civ. Proc. 54(a). Therefore, *Mendenhall* is inapplicable to the instant case. As an appeal may be taken from an interlocutory order pursuant to 28 U.S.C. § 1292(c)(2), such an interlocutory order is a "judgment" under Rule 59(e).

*2. Nikken's Notice of an Appeal Does Not Divest This Court of Jurisdiction Over Magnesystems' Motion to Amend Judgment.*

**\*3** Nikken asserts that its filing of the Notice of Appeal divested this Court of its subject-matter jurisdiction over Magnesystems' motion to amend judgment. (Defs.' X-Mo. at 20:25-28 - 21:1-3.) Therefore, Nikken reasons, this Court is without jurisdiction to consider Magnesystems' Rule 59(e) motion to amend judgment.

Ninth Circuit law controls this procedural issue. *Hybritech Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1450 (Fed. Cir. 1988). The Ninth Circuit follows the general rule that the filing of an effective Notice of Appeal to a circuit court divests the district court of jurisdiction over all matters involved in the appeal. *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58 (1982); *Hybritech Inc.,* 849 F.2d at 1450. "[T]he rule is not a creature of statute and is not absolute in character." *Hoffman v. Beer Drivers & Salesmen's Local Union No. 888,* 536 F.2d 1268, 1276 (9th Cir. 1976). Where, as here, the filing of an 59(e) motion has nullified a Notice of Appeal, a district court has jurisdiction over a 59(e) motion.

The Ninth Circuit has stated that under Federal Rule of Appellate Procedure 4(a)(4)(C), the filing of a timely motion to amend judgment pursuant to Federal Rule of Civil Procedure 59(e) makes a Notice of Appeal ineffective until entry of the order disposing of the motion. *Tripati v. Henman,* 845 F.2d 205, 206 (9th Cir.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(Cite as: 1994 WL 808421, *3 (C.D.Cal.))**

1988) (per curium) (citing *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 61 (1982)) (district court had jurisdiction to consider Rule 59(e) motion filed subsequent to filing of appeal of grant of summary judgment). *See also, Yniques v. Cabral,* 985 F.2d 1031, 1033 (9th Cir. 1993) (filing of a 59(e) motion affects a notice of appeal while filing of a 60(b) motion does not); *Tinsley v. Borg,* 895 F.2d 520, 523 (9th Cir. 1990), *cert. denied,* 498 U.S. 1091 (1991) (Rule 59(e) motion effectively revives the district court's jurisdiction, and a new notice of appeal must be filed after disposition of the 59(e) motion); 9 James Wm. Moore, *et al., Moore's Federal Practice,* ¶ 203.11, at 3-51 (1994) (Rule 59(e) motion to amend the judgment effectively revives the district court's jurisdiction).

Federal Rule of Appellate Procedure 4(a)(4)(C) provides that if any party makes a timely motion to amend the judgment under Rule 59 of the Federal Rules of Civil Procedure, the time for appeal runs from the entry of the order disposing of such a motion. Fed. R. App. P. 4(a)(4)(C). Rule 4(a)(4) states in pertinent part:

> A notice of appeal filed after announcement or entry of the judgment but before disposition of any of the above motions is *ineffective* to appeal from the judgment or order, or part thereof, specified in the notice of appeal, until the date of the entry of the order disposing of the last such motion outstanding.

Fed. R. App. P. 4(a)(4) (emphasis added). The *Tripati* decision interpreted this language to mean that a 59(e) motion nullifies a Notice of Appeal. *Tripati,* 845 F.2d at 206.

**\*4** Neither *Hybritech Inc. v. Abbott Laboratories,* 849 F.2d 1446 (Fed. Cir. 1988) or *Power Controls Corp. v. Hybrinetics, Inc.,* 806 F.2d 234 (Fed. Cir. 1986) is to the contrary. In *Hybritech, Inc.,* the court of appeals found that the notice of appeal did not divest the district court of jurisdiction to reduce its oral findings of facts and conclusions of law to writing because such reduction aided the court of appeals in its review. *Hybritech, Inc.,* 849 F.2d at 1450. Hence, *Hybritech, Inc.* stands for yet another exception to the general rule that the filing of a notice of appeal divests the district court of jurisdiction over the matters appealed.

In *Power Controls Corp.,* the district court modified a preliminary injunction two-and-a-half months after the notice of appeal had been filed and only three days before the court of appeals was to hear oral argument. *Power Controls Corp.,* 806 F.2d at 238. Thus, the modification was made long after appellant had filed its opening brief in which it attacked the district court's failure to make the findings allegedly necessary for the preliminary injunction. *Id.* In modifying the injunction, the district court made several findings of fact, and in fact, was accused of reacting in response to appellant's brief. *Id.* at 237-38. Therefore, the district court's action was an ineffective use of judicial resources because it duplicated the court of appeals' review. [FN2] In the instant case, the motion to amend judgment was filed seven days after the filing of the Notice of Appeal. Consequently, the concerns present in *Power Controls Corp.* are not present in the instant case.

Under the Ninth Circuit's holding in *Tripati,* it would be error for this Court to deny Magnesystems' 59(e) motion solely on the ground that it lacked jurisdiction. *Tripati,* 845 F.2d at 206. Therefore, Ninth Circuit law dictates that this Court must exercise its jurisdiction over Magnesystems' 59(e) motion to amend judgment. [FN3]

**B. The Issuance of a Permanent Injunction Is Warranted.**

An injunction should issue once infringement has been established unless there is a sufficient reason for denying it. *W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 842 F.2d 1275, 1281 (Fed. Cir. 1988). Nikken argues that entry of a permanent injunction should be stayed pending appeal.

In deciding whether to grant a stay of an injunction pending appeal in a patent infringement case the Court must consider the following factors: 1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; 2) whether the applicant will be irreparably injured absent a stay; 3) whether issuance of the stay will substantially injure the other parties interested in the proceedings; and 4) where the public interest lies. *Standard Havens Products, Inc. v. Gencor Industries, Inc.,* 897 F.2d 511, 512 (Fed. Cir. 1990), *cert. denied,* 113 S. Ct. 60 (1992). Each factor need not be given equal weight. *Id.* "Rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Hybritech, Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1451 (Fed. Cir. 1988). Finally, injunctive relief in a patent case will not be stayed pending appeal unless the party seeking that relief meets the burden of establishing compelling reasons justifying it. *Laitram Corp. v. Rexnord,* 15 U.S.P.Q.2d 1161, 1174 (E.D. Wis. 1990), *rev'd on other grounds,* 939 F.2d 1533

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

**(Cite as: 1994 WL 808421, \*4 (C.D.Cal.))**

(Fed. Cir. 1991).

**\*5** Nikken asserts that, while it understands that this Court disagrees with Nikken's interpretation of Plaintiff's patent claims, Nikken's interpretation is "grounded upon proper application of the relevant case law." (Defs.' X-Mo. at 32:13-20.) As evidenced by this Court's lengthy discussion in the Order, this Court does not agree with Nikken that its interpretation of Plaintiff's patent claims is well-grounded in case law. Additionally, this Court remains unconvinced by Nikken's arguments regarding claim interpretation. Therefore, Nikken has failed to make a strong showing that it is likely to succeed on the merits.

Nikken asserts at different places in its cross-motion that it "would" or ""could" be irreparably harmed if the injunction is not stayed pending appeal. (*Compare* Defs.' X-Mo. at 6:17-28 - 7:1-6 *with* Defs.' X-Mo. 33:18-26.) Nikken states as follows:

> [T]he product Nu-Magnetics manufactures accounts for virtually 100% of its sales and profits. The continued existence of Nu-Magnetics could therefore be placed in jeopardy if an injunction is issued. Its credibility in the marketplace, along with that of Nikken's and their 16,000 independent distributors of Nu-Magnetics' product, could be irreparably harmed during just the time that Defendants' appeal is pending.

(Defs.' X-Mo. at 33:18-26; *see generally,* Affidavit of Anthony Bove, President of Nu-Magnetics, Inc.) This Court must consider whether Nikken *will* be irreparably injured absent a stay. Furthermore, it is Nikken which carries the burden of establishing its irreparable injury. *Laitram Corp.,* 15 U.S.P.Q.2d at 1174.

This Court contrasts Nikken's alleged irreparable injury and the evidence that supports its allegations with the alleged irreparable injury in *Standard Havens Products, Inc. v. Gencor Industries, Inc.,* 897 F.2d 511, 512 (Fed. Cir. 1990), *cert. denied,* 113 S. Ct. 60 (1992). In *Standard Havens Products, Inc.,* Gencor, the party seeking a stay of the injunction, alleged "that without a stay it was likely to suffer irreparable harm in the form of employee layoffs, immediate insolvency, and, possibly, extinction." *Standard Havens Products, Inc.,* 897 F.2d at 515. The court noted that Gencor's financial condition was shaky, its physical assets were already encumbered, and it could not obtain even a partial bond. *Id.* Thus, the somewhat speculative irreparable harm alleged by Nikken does not reach the level of irreparable harm present in *Standard Havens Prods.* Additionally, even if "the product Nu-

Magnetics manufactures accounts for virtually 100% of its sales and profits," (Defs.' X-Mo. at 33:18-20), Nikken is in no position to complain that its entire business may be destroyed by entry of an injunction if it has built that entire business on an infringing product. *See, e.g., Windsurfing International, Inc. v. AMF, Inc.,* 782 F.2d 995, 1003 n.12 (Fed. Cir.), *cert. denied,* 477 U.S. 905 (1986).

**\*6** Against the alleged possible harm to Nikken, the Court must balance the injury to Magnesystems if the injunction is stayed. Irreparable harm to a patent owner is presumed once patent infringement has been determined. *Richardson v. Suzuki Motor Co.,* 868 F.2d 1226, 1247 (Fed. Cir.), *cert. denied,* 493 U.S. 853 (1989). "This presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm." *Id.* Additionally, Magnesystems alleges that if Nikken is allowed to continue their infringement pending appeal, Magnesystems' market share will decrease. (Pl.'s Opp. to Defs.' X-Mo. at 12:1-3.) Thus, Magnesystems has established that it will suffer irreparable harm at least equal to the injury alleged by Nikken if a permanent injunction is stayed.

Finally, the Court must consider where the public interest lies. As explained at length in the Order, this Court believes that Nikken has infringed Magnesystems' valid patent. Public policy favors the "protection of rights secured by valid patents." *Polaroid Corp. v. Eastman Kodak Co.,* 228 U.S.P.Q. 305, 344 (D. Mass. 1985), *aff'd,* 833 F.2d 930 (Fed. Cir. 1986). Therefore, it is in the public interest that Nikken be enjoined from further infringement of Magnesystems' valid patent.

For all these reasons, the Court grants Magnesystems' motion to amend judgment to add a permanent injunction and denies Nikken's cross-motion for stay of injunction pending appeal. Furthermore, the Court incorporates into this Order Plaintiff's Proposed Order Re: Amendment To Judgment To Add Permanent Injunction. Finally, because the granting of Magnesystems' motion to amend judgment renders Magnesystems' motion for permanent injunction moot, the Court denies the motion for permanent injunction.

**C. Defendant Nikken's Motion for Stay of Discovery and Other Proceedings Pending Outcome of Appeal**

*1. Stay of Discovery*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 808421, *6 (C.D.Cal.))

The Court may but is not required to stay discovery as to Magnesystems' damages in this action. Federal Rule of Civil Procedure 62(a) provides as follows:

> Unless otherwise ordered by the court, ... a judgment or order directing an accounting in an action for infringement of letters patent, shall not be stayed ... during the pendency of an appeal.

Fed. R. Civ. P. 62(a). Thus, the Court may stay discovery when it appears there is good reason to do so.

Nikken argues that if it is successful in its appeal, and prevails in the instant action, Magnesystems will not be entitled to damages. Thus, until a final disposition of the liability issue is reached in the instant action, it should be allowed to avoid the expense of responding to discovery.

Magnesystems argues that Nikken's expenses in responding to discovery are not great, and even if the Order is overturned on appeal, this matter will be remanded to this Court for trial. Thus, Magnesystems argues, the discovery expense is inevitable.

*7 The policy underlying section 1292(c)(2) is the avoidance of needless damages accountings in patent cases. *McCullough v. Kammerer Corp.,* 331 U.S. 96, 98 (1947). The Court disagrees with Magnesystems that such expense is inevitable. Furthermore, regardless of whether the expense is great or small, any needless expense is to be avoided. Finally, Magnesystems will not suffer any additional injury by the grant of such a stay. Therefore, the Court grants Nikken's motion for a stay as to discovery *only.*

### 2. Stay of Other Proceedings

Nikken urges this Court to stay all proceedings in this case pending appeal. Nikken does not delineate what these proceedings might be. The Court will not speculate as to what these proceedings might be, and cannot properly consider whether future speculative proceedings should be stayed. Therefore, the Court denies Nikken's motion for a stay pending appeal as to all proceedings other than discovery.

### D. Defendants' Cross-Motion for Stay of Injunction and/or Proceedings Pending the Outcome of Reexamination Proceedings.

Nikken urges this Court to stay any injunction and/or proceedings pending the outcome of reexamination proceedings. On July 5, 1994, Nikken filed a "Request for Reexamination" with the Patent and Trademark Office ("PTO"). (Defs.' X-Mo. 36:11-17.) In its request, Nikken presented the PTO with prior art not presented to this Court or considered previously by the PTO. (*Id.* at 36:18-24.) Nikken argues that these new prior art references present a substantial new question of patentability. (*Id.* at 37:5-8.)

The prior art references are an Australian patent and a French patent. (*Id.* at 36:18-24.) This Court is familiar with the French patent, having studied it previously when Nikken argued in its summary judgment motion that the French patent anticipated patent '711. This Court has rejected Nikken's argument that the French patent anticipated patent '711. (Order of June 16, 1994, at 20:24-28 - 21:1-15.)

While this Court is not familiar with the Australian patent, Nikken was aware of the Australian patent when it filed its motion for summary judgment. (Reagin Decl., Exhibit 1, at 3.) Nikken chose not to present this evidence to the Court in support of its summary judgment motion. Therefore, this Court infers that the Australian patent does not support Nikken's argument that patent '711 is invalid.

This Court recognizes the possibility that the PTO may grant Nikken's request for reexamination, and, upon reexamination, may even find patent '711 invalid. Nevertheless, this Court may not abdicate its responsibility to adjudicate this matter to the PTO. This Court has determined that patent '711 is valid and that Nikken has infringed patent '711. Consequently, Magnesystems is entitled to immediate relief. Therefore, the Court denies Nikken's cross-motion for stay of injunction and/or proceedings pending the outcome of reexamination proceedings.

### III. Conclusion

*8 For all the reasons stated above, the Court GRANTS Plaintiff Magnesystems' Motion for Amendment of Judgment Providing for Entry of Permanent Injunction; GRANTS Defendant Nikken's Motion for Stay as to Discovery only and DENIES Defendant Nikken's Motion for Stay as to All Other Proceedings; and DENIES Defendant Nikken's Cross-Motion for Stay of Injunction Pending Appeal and/or Stay of Proceedings Pending Outcome of Reexamination Proceedings. Additionally, the Court incorporates into this Order Plaintiff's Proposed Order Re: Amendment to Judgment To Add Permanent Injunction. Finally, because the granting of Plaintiff Magnesystems' Motion for Amendment of Judgment Providing for Entry of Permanent Injunction renders Plaintiff Magnesystems' Motion for Permanent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
**(Cite as: 1994 WL 808421, \*8 (C.D.Cal.))**

Injunction moot, the Court DENIES Plaintiff Magnesystems' Motion for Permanent Injunction.

SO ORDERED.

> FN1.  The Order was *entered* on June 16, 1994. Therefore, Magnesystems' motion for amendment of judgment was filed in a timely fashion.

> FN2.  The policy underlying the *Tripati* decision is judicial economy.
> Because the purpose of Rule 4(a)(4) is to prevent duplication of effort by the courts, appellate review of the underlying merits of Tripati's summary judgment appeal would be premature prior to the district court's consideration of the motion to alter or amend the judgment.
> *Tripati*, 845 F.2d at 206.

> FN3.  There are two additional grounds for finding that Nikken's Notice of Appeal does not deprive this Court of its jurisdiction over Magnesystems' Rule 59(e) motion.
> First, Nikken's Notice of Appeal may be ineffective because the Order may not be appealable under 28 U.S.C. § 1292(c)(2) until this Court disposes of the request in Magnesystems' Complaint for injunctive relief. *See Hoffman v. Beer Drivers & Salesmen's Local Union No. 888*, 536 F.2d 1268, 1272-73 (9th Cir. 1976) (an appeal from a nonappealable order does not deprive a district court of jurisdiction). At least one authority states that "if there is a request for an injunction against future infringement, and the demand for injunctive relief remains undecided, the determination of validity and infringement is not immediately appealable."

9 James Wm. Moore, *et al., Moore's Federal Practice*, ¶ 110.31[11], at 419 (1994) (citing numerous cases). *See also, Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 744 (1976) (if district court had granted injunctive relief in addition to granting summary judgment, interlocutory order would have been appealable under 28 U.S.C. § 1292(a)(1) even though court had not ruled on other requests for relief). In neglecting to address the requested injunctive relief in the Order, this Court never intended to deny *sub silento* the prayer in Magnesystems' Complaint for a permanent injunction. Therefore, Nikken's Notice of Appeal may be ineffective because the Order may not be appealable under 28 U.S.C. § 1292(c)(2) until this Court disposes of the request for injunctive relief.

Second, according to one Ninth Circuit case, "it is firmly established that an appeal from an interlocutory order does not divest the trial court of jurisdiction to continue with other phases of the case." *Plotkin v. Pacific Telephone & Telegraph Co.*, 688 F.2d 1291, 1293 (9th Cir. 1982) (citing *Ex parte National Enameling & Stamping Co.*, 201 U.S. 156, 162 (1906); *Phelan v. Taitano*, 233 F.2d 117, 119 (9th Cir. 1956)). While *Plotkin* and the cases to which it cites all involved the appeal of a grant or denial of an injunction, at least one court has noted that "an interlocutory appeal from a permanent injunction, to the extent that it considers questions of validity and infringement, is identical in substance to an appeal brought under [28 U.S.C.] § 1292(c)(2)." *Mendenhall v. Barber-Greene Co.*, 31 U.S.P.Q.2d 1001, 1006 n.12 (Fed. Cir. 1994).

1994 WL 808421 (C.D.Cal.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Not Reported in F.Supp.                                    **Page 7**
1991 WL 340579 (D.Minn.), 22 U.S.P.Q.2d 1401
**(Cite as: 1991 WL 340579 (D.Minn.))**

Ӈ

Motions, Pleadings and Filings

United States District Court, D. Minnesota, Fourth
Division.
MINNESOTA MINING AND MANUFACTURING
COMPANY, Plaintiff,
v.
JOHNSON & JOHNSON ORTHOPAEDIC, INC.,
Defendant.
Civ. No. 4-86-359.

July 26, 1991.
Frank Porcelli, Gregory Madera, and Robert Nabinger,
Fish & Richardson, Boston, Mass., David Forsberg,
and Karen McDaniel, Briggs & Morgan, St. Paul,
Minn., for plaintiff.

Charles Quaintance, Susan Holappa, and Anna
Korinko, Mason Edelman Borman & Brand,
Minneapolis, Minn., Stephen Judlowe, Hopgood
Calimafde Kalil Blaustein & Judlowe, David Dobbins,
Patterson Belknap Webb & Tyler, New York City, and
Eric Harris, Office of Gen. Counsel, Johnson &
Johnson, New Brunswick, N.J., for defendant.

MEMORANDUM OPINION AND ORDER FOR
JUDGMENT

DIANA E. MURPHY, District Judge.

*1 Minnesota Mining and Manufacturing Company
(3M) brought this action against Johnson & Johnson
Orthopaedics, Inc. (JJO) alleging infringement of four
United States patents, misappropriation of trade
secrets, theft, and receipt of stolen property. JJO
counterclaimed for violation of antitrust laws and a
declaratory judgment of patent invalidity and
unenforceability on the four patents, as well as
damages for fraudulent procurement and claims under
Minnesota law for fraud, unfair competition and
deceptive trade practices.

By order of reference dated October 25, 1989 and
amended on July 12, 1990, Janice M. Symchych was
appointed special master with all powers contained in
Fed.R.Civ.P. 53 to rule upon dispositive motions and
to conduct a trial on all issues without a jury, filing
findings of fact and conclusions of law. The parties
stipulated that the special master's findings of fact
should be final for purposes of entry of judgment by
the district court, pursuant to Fed.R.Civ.P. 53(e)(4).
Thirty-four days of trial were conducted before the

master in which 32 witnesses testified, including many
expert witnesses, approximately 7600 pages of
testimony were recorded, and more than one thousand
exhibits were received in evidence. Following trial
and the post-trial submissions of the parties, the special
master filed her report containing her findings of fact,
conclusions of law, and memorandum opinion
(collectively the report). Subsequently, the parties
filed motions and submitted briefs related to the
master's report. Oral arguments were held before this
court after completion of the briefing.

Now before the court for decision are:
(1) JJO's objections to the report of the special
master;
(2) JJO's motion for a limited remand to the special
master, or in the alternative for a stay of injunction
pending appeal; and
(3) 3M's motion for immediate adoption of the
report of the special master and entry of a
permanent injunction. [FN1]

Background
A lengthy factual history of the products and conduct
involved in this case is set forth in the report of the
special master and need not be repeated here because
of the stipulation. The patents at issue are D.C.
Garwood et al., U.S. Patent No. 4,502, 479 issued
March 5, 1985 (Garwood); K.E. Reed, U.S. Patent No.
4,609,578 issued September 2, 1986 (Reed); M.T.
Scholz et al., U.S. Patent No. 4,667,661 issued May
26, 1987 (Scholz I); and M.T. Scholz et al., U.S.
Patent No. 4,774,937 issued October 4, 1998 (Scholz
II).

At one time, the dominant materials used to make
casts such as those needed to set fractures were plaster
of Paris bandages. JJO was the leading manufacturer
of this product. The disadvantages of such bandages
included their weight and bulk, their breakdown in
water, and skin irritation due to their limited air and
moisture permeability. 3M, JJO, and others conducted
research to find ways around these problems. 3M's
four patents at issue here each involve the development
and improvement of fiberglass/resin alternatives to
plaster of Paris for casting materials.

*2 The Garwood patent covers a cast made of a
certain kind of knit fiberglass fabric combined with a
water-curable resin. It is strong, lightweight, water-
resistant, porous, and quick curing, but difficult to
wrap over rounded body parts such as elbows and heels

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

due to its lack of stretchiness. Its frayed ends also form sharp needles when coated with resin.

The Reed patent covers a process whereby the fiberglass fabric can be made stretchy and easier to apply, and by which sharp frayed ends are prevented.

3M's commercial products embodying the Garwood and Reed patents proved highly successful in the market, gradually coming to replace plaster of Paris. These products retained one significant drawback in comparison to plaster of Paris, however, namely that the fiberglass/resin combination was very sticky, or tacky, during application. This feature made it difficult to mold.

The Scholz patents cover a product which adds various lubricants to the resin making it slippery and more easily molded. The patents provide a test by which friction can be measured on casting materials. Scholz II is a continuation patent from Scholz I. 3M's commercial products embodying the Scholz patents have been enormously successful in the market.

Subsequent to 3M's introduction of each of these commercial products, JJO introduced a competitive product with similar characteristics. *See* chart reproduced from the report of the special master, attached hereto as appendix A. 3M alleged that these products infringed its patents, and that some of the information JJO used to develop these products was wrongly procured.

The special master found that all four patents were valid, enforceable, and were infringed by JJO, three of them willfully, and awarded 3M $53,636,348 in total infringement damages, doubled due to willfulness to $107,272,696, plus prejudgment interest in the amount of $9,525,000. She denied an award of attorney fees. She also found that JJO had violated the Minnesota Trade Secrets Act, Minn.Stat. § 325C. She held that 3M did not have a claim for theft or receiving stolen property. She concluded that all of JJO's counterclaims should be dismissed.

Standard of Review

The stipulated order provides that the findings of fact of the special master are final for the purpose of entry of judgment by the district court. Her conclusions of law are subject to *de novo* review by this court. It is not the label she may have used which is conclusive as to which standard of review to apply, but the character of the finding. *Fromson v. Western Litho Plate & Supply Co.,* 853 F.2d 1568, 1571 n. 5 (Fed.Cir.1988);

5A *Moore's Federal Practice* ¶ 52.03[2]. Findings of fact which underlie a conclusion of law are final here because of the stipulated order.

The parties disagree as to the standard of review for the decision to multiply damages due to willful infringement. JJO argues that because multiplying damages is committed to the discretion of the court, and is not a finding of fact like compensatory damage, it must be subject to *de novo* review. 3M argues that the special master's discretionary decisions should be subject to the same standard of review here as they would be on appeal to the Federal Circuit, namely abuse of discretion.

*3 JJO argues on another issue--the standard of review for the methodological decisions underlying the award of damages--that the abuse of discretion standard applied by the Federal Circuit should also be applied by this court. *Compare* JJO's Memorandum Supporting Objections at 58 (*de novo* review of non-fact decisions) *with id.* at 63 (abuse of discretion review for same kind of decision). Discretion to choose damages methodology has been established by the Federal Circuit in case law, *see Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.,* 926 F.2d 1161, 1164 n. 2 (Fed.Cir.1991), while the discretion to multiply damages has been expressly established by statute, 35 U.S.C. § 284. The case cited by JJO to support its position that the exercise of the special master's discretion is subject to *de novo* review is inapplicable here. *Monmouth County Correctional Institution Inmates v. Lanzaro,* 695 F.Supp. 759 (D.N.J.1988), involved the report and recommendation of a special master concerning prison conditions. It did not involve a stipulated trial pursuant to Fed.R.Civ.P. 53, nor the particular discretion committed to the trial court under patent laws.

The decision of the special master to multiply damages is subject to review here for abuse of discretion. The special master heard the evidence, and the decision to multiply damages is to be made "informed by the court's familiarity with the matter in litigation." *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.,* 781 F.2d 198, 201 (Fed.Cir.1986). The decision is intimately bound up with the totality of the circumstances and facts of the case. The special master was the trial judge here; this court reviews her exercise of discretion similarly to an appellate court.

In summary, we have three standards here: (1) no review of findings of fact; (2) *de novo* review of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          **Page 9**
**(Cite as: 1991 WL 340579, *3 (D.Minn.))**

conclusions of law;  and (3) review of the exercise of discretion for a clear showing of abuse.

The issues before the court and the standard of review (as fact, [FN2] law, or discretion) for each may be outlined:

Summary of Issues

```
I.    INFRINGEMENT
      A.   Garwood
           1.   claim interpretation (law)
           2.   infringement (fact, but dependent on claim interpretation)
      B.   Reed
           1.   claim interpretation (law)
           2.   infringement (fact, but dependent on claim interpretation)
      C.   Scholz I
           1.   claim interpretation (law)
           2.   infringement (fact, but dependent on claim interpretation)
      D.   Scholz II
           1.   claim interpretation (law)
           2.   infringement (fact, but dependent on claim interpretation)
II.   VALIDITY
      A.   Obviousness (law)
           1.   Garwood
           2.   Reed
      B.   Anticipation (fact)
      C.   Indefiniteness (law)
           1.   Garwood
           2.   Scholz
III.  ENFORCEABILITY (discretion, but dependent on certain fact findings)
      A.   Garwood
      B.   Reed
      C.   Scholz
IV.   MISAPPROPRIATION OF TRADE SECRETS
      A.   Statute of limitations (law)
V.    WILLFULNESS (fact)
VI.   DAMAGES
      A.   Infringement
           1.   lost profits and royalties (fact)
           2.   multiplier for willfulness (discretion)
      B.   Trade secrets (fact)
      C.   Pre-judgment interest (fact)
VII.  INJUNCTIVE RELIEF
      A.   Stay of injunction (law)
      B.   Scope of injunction (law)
```

Discussion

I. INFRINGEMENT

A. *Garwood*

**\*4** The only independent product claim in the Garwood patent is claim 1 which reads:

An orthopedic casting material comprising a fabric made from a fiber having an initial modules of elasticity having a thickness between 0.020 and 0.045 inch and a mesh size of 20 to 200 openings per square inch and a reactive fluid polyisocyanate prepolymer resin impregnated in said fabric which hardens when said resin is wetted with water.

At issue in the interpretation of this claim is the meaning of the claim's mesh openings requirement. The special master concluded that the number of mesh openings is determined by multiplication of the courses and wales of the knit fabric (CL 7). "Courses" are the structural knitting elements that run across the fabric; "wales" are the knitting elements that run the length of the fabric (FF 33).   The openings formed where courses and wales are looped around each other are "needle loops" (FF 34).

JJO argues that the definition of mesh size by means of this rectilinear grid of courses and wales is arbitrary and an error of law.   JJO contends that the claim

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 10
(Cite as: 1991 WL 340579, *4 (D.Minn.))

should be interpreted with a functional definition of mesh openings. According to JJO, the function of the holes in the fabric is to allow air and water to pass through them in order to allow the resin to set and the cast to breathe.    Thus determining the number of openings should be a simple matter of counting the actual openings in the fabric as revealed under magnification. Counted in this manner, JJO's product contains in excess of 500 openings per square inch, clearly outside the 20 to 200 range stated in the patent.

3M responds that the special master determined the meaning of the words of the Garwood claim in accord with settled law by making findings of fact based on the patent specification, the prosecution history of the patent, the prior art, and expert testimony (see FF 32-51).    3M argues that these findings control the conclusion of law regarding the claim interpretation of mesh openings.

"A claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1118 (Fed.Cir.1985).    The special master found that the prosecution history of the patent would reveal to a person of ordinary skill in the relevant art that the patent defines mesh openings by courses and wales (FF 39).    The commercial fabrics identified in Table I of the patent and listed in the prosecution history determine mesh openings by courses and wales (FF 40).    The special master found that the prior art teaches that the mesh openings in orthopedic casting tapes are computed based on courses and wales (FF 41).    The prior art Corvi patent and Garwood-Taw patent expressly state this definition (FF 41-43). Although the claim language of the Garwood patent does not expressly define mesh openings by courses and wales, the proper conclusion in light of all the relevant factors is that this is the definition stated by the claim.    JJO's proffered definition is not supported by any of the relevant factors nor by the language of the claim.    JJO contends that the special master construed the claim with a view toward its accused product, which would be clear legal error.    *See SRI Int'l, supra*, 775 F.2d at 1118.    This contention is contradicted by her findings which do not construe the claim in reference to JJO's product but in light of the appropriate factors under the law (FF 32-51).

*5 Whether an accused device infringes properly interpreted claims is a question of fact.  *Fromson v. Western Litho Plate & Supply Co., supra*, 853 F.2d at 1571.  Because the special master properly interpreted

the Garwood claim, her finding of infringement by JJO is not reviewable here.

B. *Reed*

JJO does not challenge the claim interpretation of the special master concerning the Reed patent.    Her conclusions of law and finding of infringement are final.

C. *Scholz I*

The claims at issue in the Scholz I patent read as follows:

12.  An article comprising a curable resin-coated sheet having a lubricant at a major surface of the coated sheet, wherein said lubricant comprises an additive which is a mixture of any of the compositions selected from the group consisting of a surfactant, a polymer comprised of a plurality of hydrophilic groups, and a polysiloxane, and wherein said lubricant is present in an amount such that the kinetic coefficient of friction of the coated surface of the sheet material is less than about 1.2.

17.  An article comprising a pre-lubricated curable resin-coated sheet wherein the curable resin is a water-curable isocyanate-functional prepolymer which is a derivative of an aromatic polyisocyanate and wherein a major surface of the sheet exhibits a kinetic coefficient of friction of less than about 1.2.

The special master concluded that these claims should be interpreted as relating to a casting tape which is pre-lubricated and which exhibits a low kinetic coefficient of friction (KCOF) because the lubricant has caused the resin on the tape to become slippery when activated (see CL 13).    The patent sets forth a test for determining the KCOF of a casting tape.    A special sled is pulled a specified distance along a certain length of the tape thirty-three seconds after the resin has been activated, measuring the resistance or slipperiness of the surface (FF 73, 74).

JJO argues that the special master misinterpreted these Scholz I claims by adding two limitations to the claims which are not there.    First, JJO contends that she added a limitation that the patent covered "slippery" resins instead of an article meeting certain test standards.    "Slipperiness" is an ephemeral characteristic, according to JJO, too vague to apprise competitors in the field of the metes and bounds of the monopoly being claimed (CL 13).    The patent does not use the term "slippery" and instead uses the KCOF test objectively to define the articles which it covers. Second, JJO contends that the special master construed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a limitation on the claims: that in order accurately to compare the test results of different resins, the tapes upon which the resins are applied must be the same (FF 73). There is no hint in the patent that its test depends on identical substrates; on the contrary, the patent claims to cover all casting tapes with a KCOF of less than about 1.2. According to JJO, the special master added this limitation in order to save the patent from anticipation and to be able to find that it was infringed.

**\*6** Particular limitations appearing in the specification will not generally be read into the claims. *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 867 (Fed.Cir.1985). It is the wording of the claim which sets forth the subject matter of the invention. 35 U.S.C. § 112; *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433 (Fed.Cir.), *cert. denied,* 488 U.S. 986 (1988). But the words of the claim may need to be construed by the court.

> It is entirely proper to use the specification to interpret what the patentee meant by a word or phrase in the claim.... But this is not to be confused with adding an extraneous limitation appearing in the specification, which is improper. By "extraneous," we mean a limitation read into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.

*E.I. Du Pont de Nemours,* 849 F.2d at 1433 (cite omitted).

The Scholz I patent does not expressly cover slipperiness in claims 12 and 17, but neither is slipperiness merely imported as an extraneous limitation from the specification. Certain words and phrases of these claims require use of the specification for proper interpretation, and the specification makes clear that these words and phrases are meant to include the limitation of slipperiness. The claims state that they cover a material "having a lubricant" (claim 12) or which is "pre-lubricated" (claim 17). The lubricant is described as "an additive" of a certain composition and with certain characteristics (claim 12). A conventional definition of "lubricate" is "to make smooth, slippery, or oily in motion, action, or appearance." *Webster's Third New Int'l Dictionary of the English Language, Unabridged* at 1343 (1981). The claims describe the effect of the lubricant as producing a KCOF of less than about 1.2, thus correlating the test for KCOF with the meaning of the term lubricate. To properly interpret the meaning of the terms of the claims, the function or purpose of the lubricant in the invention needs explication. This explication is provided in the

patent specification.

The specification does expressly state that slipperiness is an attribute of the lubricant in the invention claims. Regarding the pre-lubricated material of claim 17, the patent specification states:

> The pre-lubricated sheet of this invention exhibits reduced tack prior to and/or during cure of the pre-polymer and yet forms a cast which exhibits acceptable strength and lamination of the wrapped layers. As used herein, a pre-lubricated sheet is a sheet which has the lubricant at the surface of the coated sheet about a substrate, including when used as an orthopedic bandage.

Col. 3, lines 38-45. The specification also states:

> One aspect of this invention is a sheet, e.g., a scrim, coated with a curable resin wherein one or more hydrophilic groups are chemically bound to the resin. When this orthopedic casting material is brought into contact with water, the hydrophilic group causes the resin to become *slippery*. This allows for easy application and molding of the cast for the most efficacious fit without the casting material *sticking* to the gloved hands of the person applying the cast. As noted above, this is advantageous because if the casting material is *sticky,* application and molding of the cast is difficult.

**\*7** Col. 6, lines 54-64 (emphasis added). Regarding the additive lubricant of claim 12, the patent specification states:

> When immersed in water, the tapes quickly become *very slippery*. The rolls unwind easily and *do not stick* to gloves. After the roll is wrapped around the limb, molding of the cast becomes easy due to the *non-tacky* nature of the resin. The cast can be rubbed over its entire length *without sticking* to the gloves and the layers of tape do not separate from each other. This pre-lubricating resin approaches the handling characteristics of plaster of Paris bandages very closely.

Col. 11, lines 21-29 (emphasis added). At the outset of the patent, the background problem the patent addresses is stated as follows:

> When a roll of tape coated with a tacky resin is used, molding the cast is difficult. The reason for this difficulty is that the glove sticks to the resin and when attempts are made to smooth the cast and form it the layers of tape pull apart from each other thus requiring reforming of part of the cast. It is believed that all curable resin coated orthopedic casting materials currently available suffer from the above-noted problems.

Col. 1, lines 29-37. In this light, the claims are

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

properly construed to relate to a casting tape which is pre-lubricated and exhibits a low KCOF because the lubricant has caused the resin on the tape to become slippery when activated (CL 13). This does not add an extraneous limitation but interprets the language of the claims in light of the specification.

JJO's second argument is also unpersuasive--that the special master misconstrued the Scholz I claims by adding a limitation that accurately to test and compare resins, the tapes upon which the resins are applied must be the same. The patent sets out in detail the procedures for testing for KCOF. It states that the test is based on the American Society for Testing Materials Standards, ASTM D 1894, "Standard Test Method for Static and Kinetic Coefficients of Friction of Plastic Film and Sheeting." The special master found that a person of ordinary skill in the relevant art would understand that to compare resins accurately, the tapes upon which the resins are applied must be the same (FF 73, memorandum opinion at 24). Because the claims refer to the test set out in the specification, and the specification makes the above procedure clear, the claims are properly construed to mean that the KCOF of less than about 1.2 must be measured by those procedures.

Since the claims of Scholz I were properly interpreted, the master's finding of infringement based on that interpretation is not reviewable here.

D. *Scholz II*

The special master concluded that the Scholz II patent, a continuation patent to Scholz I, should be interpreted as covering a resin which is not appreciably dispersible in water, meaning that the resin does not leave the casting tape when the roll of tape is dipped in water. JJO does not challenge the claim interpretation of the special master concerning the Scholz II patent except for claims it has in common with Scholz I, which has already been considered. Her conclusions of law and finding of infringement are final.

II. VALIDITY

A. *Obviousness*

*8 A patent may not be obtained if the differences between the subject matter sought to be patented and the prior art are such that the claimed subject matter would have been obvious at the time the invention was made to a person having ordinary skill in the relevant art. 35 U.S.C. § 103. Obviousness is a question of law

based on factual inquiries. *Constant v. Advanced Micro-Devices, Inc.,* 848 F.2d 1560, 1572 (Fed.Cir.), *cert. denied,* 488 U.S. 892 (1988). Those factual inquiries are:

(1) the scope and content of the prior art;

(2) the differences between the prior art and the claims at issue;

(3) the level of ordinary skill in the art at the time when the invention was made; and

(4) objective evidence of nonobviousness, including commercial success, long felt need, unexpected results, and failure of others.

*Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 989 (Fed.Cir.1988). In order to have a patent declared invalid for obviousness, JJO must overcome the statutory presumption of the validity of the patent. *Id.* at 991. The findings of fact by the special master are not reviewable here, but the legal conclusion concerning obviousness is subject to *de novo* review.

(1) *Garwood.*

The special master found that the prior art does not suggest the Garwood invention (FF 145-51). She found that the prior art contained significant differences from the Garwood claims which prevented it from solving the problems of producing an effective fiberglass cast (FF 145). She found that the prior art may have piqued the interest of persons of ordinary skill in the art in the possibility of trying a knit fiberglass cast as claimed in Garwood, but the prior art did not make it obvious that the results obtained in Garwood could in fact be obtained; indeed, persons skilled in the art had tried to make fiberglass casts and had failed (memorandum opinion at 12-13, FF 123-33). *See Gillette Co. v. S.C. Johnson & Son, Inc.,* 919 F.2d 720, 725 (Fed.Cir.1990) ("we have consistently held that 'obvious-to-try' is not to be equated with obviousness under 35 U.S.C. § 103"). She found that the Garwood invention solved a long felt need in the industry (FF 134-36) and that it enjoyed tremendous commercial success due to its technical merits (FF 140-42). Based on these findings, she concluded that the Garwood invention was not invalid for obviousness (CL 22).

JJO argues that the Garwood invention was obvious because prior art showed that fiberglass casting tape could be combined with certain water-activated resins to form a cast. According to JJO, the special master erred in dismissing prior art disclosures of the use of knit fiberglass with these resins; although prior art did not consider knit fiberglass the preferred fabric, it did disclose fiberglass as a usable fabric among others.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The special master also erred in holding prior art to the standard of an enabling reference. She erred in crediting evidence that persons skilled in the art thought fiberglass would not work. And she erred by not concluding Garwood was invalid under the "obvious-to-try" standard.

**\*9** The special master's findings, final here, that the prior art does not suggest Garwood and contained significant differences from Garwood compel rejection of JJO's first three arguments. As to the obvious-to-try standard, the special master expressly found that persons skilled in the art had tried and failed to solve the long felt needs in the industry, and that the Garwood invention resulted in enormous commercial success. This objective evidence of nonobviousness provides strong support for the conclusion that even if Garwood was obvious to try, it was not obvious under 35 U.S.C. § 103. *See Merck & Co. v. Biocraft Laboratories, Inc.,* 874 F.2d 804, 809 fn. (Fed.Cir.) (under obvious-to-try standard, objective evidence is given weight depending on its nature and its relationship to the merits of the invention), *cert. denied,* 110 S.Ct. 498 (1989). Under the facts presented here, Garwood was not invalid for obviousness.

### (2) Reed

The special master found that the prior art does not suggest the Reed invention (FF 174-79) and that objective evidence shows the long felt need for the Reed invention, the failure of others to achieve it, and huge commercial success upon its marketing (FF 152-73). She concluded that the Reed invention was not obvious to one of ordinary skill in the art at the time of the invention (CL 24).

JJO challenges the factual findings of the special master regarding the differences between Reed and the prior art. This challenge is misplaced, since the findings are not reviewable here. Under the facts presented here, Reed was not invalid for obviousness.

### B. Anticipation

A patent may be invalidated if its claim is anticipated by the presence in a single prior art disclosure of all elements of a claimed invention arranged as in that claim. 35 U.S.C. § 102; *Carella v. Starlight Archery and Pro Line Co.,* 804 F.2d 135, 138 (Fed.Cir.1986). Test for anticipation is similar to the test for infringement, and both are issues of fact. *Id.; see Lewmar Marine, Inc. v. Barient, Inc.,* 827 F.2d 744,

747 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1007 (1988).

JJO raises objections to the findings of the special master that the patents in suit were not invalid for anticipation, but these objections are not properly before this court since those findings are not reviewable here. It is worth noting, however, that the master made specific findings related to each prior art product or patent cited by JJO. [FN3]

### C. Indefiniteness

A patent may be invalid if it does not meet the requirements for definiteness set forth in 35 U.S.C. § 112, second paragraph: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." Compliance with the second paragraph of section 112 is generally a question of law. *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.,* 758 F.2d 613, 624 (Fed.Cir.1985). Underlying this conclusion of law are findings of fact concerning the prior art, the particular invention, and how the claims would be read by those of ordinary skill in the art. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1385 (Fed.Cir.1986), *cert. denied,* 480 U.S. 947 (1987). The amount of detail required to be included in the claims depends on these findings. *Shatterproof Glass, supra,* 758 F.2d at 624. "If the claims read in the light of the specifications, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more." *Id.*

### (1) Garwood

**\*10** The special master concluded that the Garwood patent is not invalid for indefiniteness because its claims sufficiently identify the range of mesh number openings where optimum cast performance will occur (CL 35-37). In support of this conclusion, she found that although the patent does not expressly state how mesh size openings per square inch is determined, a person of ordinary skill in the casting art would understand from Table I of the patent, its prosecution history, and prior art that this determination is made by counting the courses and wales of the fabric (FF 32-51). She heard testimony from knitting experts, and found that the credible expert testimony supports this finding (FF 44-48).

JJO argues that the method of counting mesh openings

Not Reported in F.Supp.
(Cite as: 1991 WL 340579, *10 (D.Minn.))

Page 14

in Garwood is indefinite. It argues that a functional definition of openings--based on their function as stated in the patent of allowing water to pass through to activate the resin and air to pass through to eliminate moisture from the wearer's skin--should provide the basis for counting openings. It point out that the rectilinear courses and wales method favored by the special master and 3M is not stated at all, let alone with definiteness, in the patent.

This argument is not persuasive, for the findings of the special master compel the conclusion that the method of determining mesh openings is stated with sufficient definiteness in Garwood. In light of the patent Table I, its prosecution history, and the prior art, all as understood by one of ordinary skill in the art, JJO's alternative definition of mesh openings does not render the Garwood claims indefinite. The claims reasonably apprise those skilled in the art of the utilization and scope of the invention.

*(2) Scholz*

The special master concluded that the Scholz patents are not invalid for lack of definiteness because they provide sufficient instruction for a person of ordinary skill in the art to perform the tests for KCOF (CL 38). This conclusion is supported by the finding that although the Scholz patents do not expressly state whether the test is performed in only one direction on the fabric or in both directions, the patents reference the ASTM method and thus state with sufficient clarity to those of ordinary skill in the art that the test is to be performed in both directions and the results averaged (FF 266- 69).

JJO raises two objections to the conclusion of sufficient definiteness. First, JJO argues that the Scholz KCOF test does not present with specificity the manner in which the measurement is to be made, so the public cannot know what is foreclosed by the patent monopoly. JJO contends that the referenced ASTM method is described in the patent as "modified" and is not made a part of the specification--thus it is not part of the patent as a matter of law. Second, JJO argues that if the patent claims are construed as including the limitation of "slipperiness" in addition to the KCOF test for friction, then the claims are indeterminate, unquantifiable, and indefinite as a matter of law. JJO contends that when the Scholz test is performed on other fiberglass/resin products, they score below about 1.2 KCOF; only this indefinite requirement of slipperiness saves the Scholz patents from invalidity by anticipation.

*11 As to JJO's first objection, the facts support a conclusion that the Scholz patents are sufficiently definite. Because the KCOF reading varies according to the direction in which the test is conducted, it is important to measure KCOF in both directions and take an average or mean reading (FF 267). The patent makes this clear by referring to the ASTM method, which requires multiple test observations (FF 268). Scholz describes 29 examples of the use of the test method, each of which conclude by stating the "mean KCOF," indicating that the test has been conducted more than once. The special master found:

> The patent, via the referenced ASTM test method, states with sufficient clarity that it is the average or mean KCOF value of a major surface that is to be determined and any such directional effects would be accommodated by the processes of averaging. A person of ordinary skill in the art would understand that a mean or average KCOF measurement includes sled readings in both directions. This is consistent with the purpose of the patents, which is to allow manual lengthwise smoothing and molding of the case in both directions.

(FF 269). In the context of the Scholz invention as described in the patents, the prior art, and how the claims would be read by those of ordinary skill in the art, the Scholz patents are not invalid for the indefiniteness of the test method. *See Hybritech, Inc., supra,* 802 F.2d at 1385.

The special master stated well the slipperiness indefiniteness problem: "The question is whether the patent reasonably apprises one skilled in the art that the patent concerns itself with tapes that exhibit a low KCOF because of the slipperiness of the resin, and not because of the fabric substrate or some other factor." Memorandum opinion at 21-22. She concluded that the patent sufficiently specifies slipperiness since overcoming the problem of tacky resin is identified as the purpose of the invention, the specifications directly relate the KCOF test to reduction of tack, and the specifications clearly state that the pre-lubricated nature of the product results in increased slipperiness over the prior art. This sufficiently apprises the art that the patent covers a product with a low KCOF *because* its lubricant reduces the tack of the resin, i.e., makes it more slippery.

Read as a whole and in context the patent does specify slipperiness with sufficient definiteness. No one familiar with the art and the commercial situation--particularly at JJO, the dominant force in the plaster of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Paris market--could fail to be impressed by the line in the patent: "This pre-lubricating resin approaches the handling characteristics of plaster of Paris bandages very closely." Col. 11, line 29. In this light, it would not make sense to hold the patent invalid for not stating with sufficient definiteness that this slipperiness is what the patent accomplishes. "A decision on whether a claim is invalid under § 112, 2d ¶ , requires a determination of whether those skilled in the art would understand what is claimed when the claim is read in light of the specification." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1576 (Fed.Cir.1986). That the specification sets forth the function of slipperiness in connection with the claim terms "pre-lubricated" and "lubricant" has been discussed already in the context of claim interpretation. Here it should be noted that the special master found that one skilled in the art would be apprised by the patent that what is claimed is a casting tape with a slippery resin (memorandum opinion at 23-24). She made extensive findings concerning the performance of the prior art and understood the position of one skilled in the art (FF 208-61). In light of its context and whole text, the patent reasonably apprises those skilled in the art of the utilization and scope of the invention. *See Shatterproof Glass Corp. v. Libbey-Owens Ford Co., supra,* 758 F.2d at 624. It should not be invalidated for indefiniteness.

## III. ENFORCEABILITY

*\*12* Inequitable conduct before the PTO in applying for a patent may render a patent unenforceable. *J.P. Stevens & Co. v. Lex Tex Ltd.,* 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822 (1985). Such conduct "includes failure to disclose material information, or submission of false material information, with an intent to mislead." *Id.* Inequitable conduct requires clear and convincing proof of a threshold degree of materiality of the information. *Id.* It also requires proof of a threshold intent to mislead. *Id.* at 1560.

### A. *Garwood*

JJO does not object to the conclusion of the special master that 3M did not commit inequitable conduct in relation to the Garwood patent (CL 40-43).

### B. *Reed*

The special master found that the Racine affidavit submitted by 3M in support of the application for the Reed patent was material, but that it was essentially

truthful and not submitted with an intent to mislead (FF 289-302, CL 44-45). JJO concedes that these findings are unreviewable here and that it cannot challenge here the conclusion that the submission of the Racine affidavit was not inequitable conduct. Nevertheless, JJO discusses at some length its reasons for arguing that the Racine affidavit was false and submitted with intent to deceive. JJO states that its discussion is relevant to review of the special master's conclusion that damages should be multiplied based on willfulness.

The special master also found that the Livermore affidavit submitted by 3M in support of the Reed patent was generally material, although she found that certain overstatements in the affidavit were not material; she found that the affidavit was essentially true and was not submitted with intent to deceive (FF 303-13, CL 44, 46). JJO makes the same concession here as with respect to the Racine affidavit, and also goes on to argue the facts.

There is no basis to challenge here the special master's conclusion with respect to the Racine or Livermore affidavits.

### C. *Scholz*

The special master found that 3M did not withhold any material information from the PTO in connection with the applications for the Scholz patents, nor that 3M had any intent to mislead the PTO (FF 314-19, CL 47-48). Although these findings of fact are unreviewable here, JJO challenges these findings on the basis of the evidence. This challenge is inappropriate in light of the stipulation.

## IV. MISAPPROPRIATION OF TRADE SECRETS

3M asserted a state law claim for misappropriation of its slippery resin trade secret under the Minnesota Uniform Trade Secrets Act (MUTSA), Minn.Stat. § 325C *et seq.* JJO does not challenge here the factual findings of the special master that it wrongfully acquired trade secrets of 3M when it received and analyzed samples of the slippery resin product, but it does challenge the legal conclusion that 3M's claim was not barred by the statute of limitations.

The special master found that Phillip Stegora, a 3M employee, stole prototype samples of the slippery resin product and mailed them to 3M's competitors. JJO received the Stegora samples on or about November 25, 1985. John Hull, a group product manager at JJO,

Case 1:98-cv-00019-SLR    Document 207-2    Filed 05/19/2005    Page 18 of 32

Not Reported in F.Supp.                                                    Page 16
(Cite as: 1991 WL 340579, *12 (D.Minn.))

sent the samples to JJO's laboratory for analysis. Fred Prince, president of JJO, thereafter ordered Hull to retrieve the samples because they were suspicious. Hull did not tell Prince that the samples had already been chemically analyzed. In February 1986, JJO correctly identified the trade secret in the stolen 3M samples and began work on its own product incorporating it. Because of this, JJO was able to bring to market its own product three months earlier than it would otherwise have been able. At the criminal trial of Stegora (resulting in conviction), Hull testified that JJO had received the samples but did not state that it had analyzed them. 3M had no reason to believe JJO analyzed or used the samples until it discovered that fact during discovery in this lawsuit. 3M reasonably relied on Hull's testimony at the criminal trial that JJO had not chemically analyzed the samples and had discarded them. However, 3M did know or strongly suspect that Stegora had sent stolen samples to JJO and never contacted JJO concerning the samples. 3M amended its complaint to add the trade secret cause of action in January 1990, more than three years after the trade secret had been sent to JJO but less than three years after being misled by Hull's testimony at Stegora's trial.

*13 MUTSA provides for a three year statute of limitations on claims as follows:

> An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered.

Minn.Stat. § 325C.06. A "misappropriation" means "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Minn.Stat. § 325C.01, subd. 3(i). A "trade secret" means "information, including a formula, pattern, compilation, program, device, method, technique or process...." Minn.Stat. § 325C.01, subd. 5.

The special master concluded that discovery of a misappropriation within the terms of MUTSA did not occur until 3M knew that JJO had wrongfully acquired the slippery resin formula, not when it only knew that JJO had wrongfully acquired the Stegora samples. Mere possession of the material was not enough to constitute the "information" which is a trade secret. She also concluded that the statute of limitations was equitably tolled by Hull's testimony which concealed facts essential to 3M's cause of action.

JJO argues that 3M's cause of action under MUTSA accrued when it knew that JJO had received the stolen samples, not when JJO had analyzed and used them. JJO also argues that Hull's testimony actually reinforced 3M's knowledge of the wrongful acquisition since he acknowledged that JJO had received (albeit had discarded) the stolen samples.

JJO's position is without merit. 3M could not have brought a trade secrets cause of action against JJO based solely upon JJO's wrongful possession of the stolen samples. Although the definition of a trade secret in Minnesota law is "information, including a ... device," Minn.Stat. § 325C.01, subd. 5, the trade secret is not the tangible object itself but the extent to which the tangible object provides "independent economic value, actual or potential, from not being generally known to ... other persons who can obtain economic value from its ... use." Id. The requirement of independent economic value from secrecy carries forward the common law requirement that to be a trade secret information must provide a "competitive advantage." Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 900 (Minn.1983). It was not the actual tangible object acquired by JJO that provided JJO with any economic value--as if JJO were intending to sell the Stegora samples. Nor would 3M have had a competitive advantage if it had maintained possession of the stolen samples and precluded JJO from selling them. The economic value of the samples, why they gave 3M a competitive advantage, was the formula they embodied which, once understood, could be reproduced. Only the formula provided economic value. The formula was the trade secret, not the tangible articles. JJO's possession of the samples alone did not give 3M a cause of action under MUTSA because JJO did not thereby acquire a trade secret.

*14 3M did not discover JJO's acquisition of its trade secret, as defined under Minnesota law, until within the three-year limitations period (memorandum opinion at 30). Accordingly, 3M's action under MUTSA is not time-barred. [FN4]

V. WILLFULNESS

The special master found that JJO willfully infringed the Reed and Scholz patents (CL 59-60) but not the Garwood patent (CL 58). As to Garwood, she found that JJO's patent counsel, Michael Tatlow, sought outside independent advice from textile experts who provided him with information that formed a colorable basis for JJO's belief that its product did not infringe Garwood (memorandum opinion at 32-33). As to Reed, she found that JJO did not seek independent

expert advice but relied in unsubstantiated claims from those with a stake in the outcome, and that JJO copied the Reed invention and knowingly infringed the patent without an independent opinion of counsel (*id.* at 33-35). As to the Scholz patents, she found that JJO acquired the means to practice the Scholz invention by misappropriating 3M's trade secret, that it knew Scholz would change the art of synthetic casting and virtually drive it from the casting market which it had dominated for decades with plaster of Paris, that it tried to itself patent the information it had misappropriated, that it decided to take the litigation position that the patents were invalid, and that it knowingly infringed the patents for a year before obtaining independent legal advice (*id.* at 35-37).

Willfulness is a finding of fact, determined under the totality of the circumstances of the case. *Kloster Speedsteel AB v. Crucible, Inc.,* 793 F.2d 1565, 1579 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1034 (1987). JJO does not directly challenge the special master's findings of willfulness, but argues that she made legal errors in the standards she applied to determine willfulness. JJO contends that the special master erroneously found JJO willfully infringed the Scholz patents with its U-Thane resins since 3M had not alleged such willful infringement and JJO did not therefore present evidence bearing on it. JJO argues that the special master applied an erroneous legal standard holding it to an impossible burden of knowing to a certainty that the 3M patents were invalid before infringing. According to JJO, she erroneously discounted the opinions of its in-house counsel. Finally, JJO argues that its alleged misappropriation of trade secrets occurred before the Scholz patent was issued and so is irrelevant as to willful infringement.

At issue in JJO's first argument are its "Green Label" and "Blue Label" products. As of 1986 (Green Label) and 1987 (Blue Label), both products contained JJO's S-Thane slippery resin. The master found that both products with S-Thane infringed the Scholz patents (FF 81-84). In September 1990, JJO began using a new slippery resin, U-Thane, which she also found infringed Scholz (FF 86-90). In her findings of fact, she stated that Green Label with U-Thane infringed Scholz as 3M had alleged. In her conclusions of law, however, she stated that both the Green Label and Blue Label products with U-Thane infringed Scholz (CL 19-20) even though 3M had never alleged that Blue Label with U-Thane infringed Scholz. 3M acknowledges that it did not make this allegation. 3M brief in response to JJO's objections at 18-19. [FN5] It contends that this inclusion of Blue Label with U-

Thane in the conclusions of law must have been inadvertent and can be stricken without affecting any other part of the special master's decision. In addition, although 3M alleged that both Green Label and Blue Label with S-Thane willfully infringed Scholz, and the special master so found, 3M acknowledges that it did not allege that Green Label with U-Thane willfully infringed Scholz. *Id.* at 37. Yet the special master simply stated that JJO willfully infringed the Scholz patents without distinguishing between its infringement by the S-Thane products and its infringement by Green Label with U-Thane (CL 60), and she doubled damages based on willfulness for the entire period in which the U-Thane products had been on the market (CL 81). 3M argues that even though JJO "began using" U-Thane in September 1990 (FF 86), it did not introduce any evidence to show that it was only selling Green Label with S-Thane from that time to the present, implying that it was still selling Green Label with U-Thane which the special master had found to be willfully infringing. 3M contends that it requested JJO to provide a breakdown of Green Label with S-Thane and U-Thane sales during this period, but JJO failed to do so. According to 3M, all doubts about JJO's failure to provide proper records and evidence of the breakdown of its sales are to be resolved in 3M's favor. For its part, JJO states without citation to the record that $10 million in U-Thane sales were improperly doubled by the special master.

**\*15** Under these circumstances, the maxim should be followed that "any adverse consequences must rest on the infringer when the inability to ascertain lost profits is due to the infringer's own failure to keep accurate or complete records." *Lam, Inc. v. Johns-Manville Corp.,* 718 F.2d 1056, 1065 (Fed.Cir.1983). The chart included in the report of the special master shows that Green Label with S-Thane has been manufactured or sold to the present time. *See* Appendix A. With no finding of fact and no record evidence on which to base any breakdown in the figures for sales of Green Label with S-Thane as opposed to U-Thane, the special master's finding of willfulness in JJO's infringement of Scholz should not be overturned.

JJO's other objections to the finding of willfulness are also unpersuasive. The special master quoted the correct legal standard for willfulness, *Ryco, Inc. v. Ag-Bag Corp.,* 857 F.2d 1418, 1428 (Fed.Cir.1988). Although she proceeded to paraphrase this standard in applying it to this case, her paraphrase was within the spirit of *Ryco* and did not place an erroneously high burden of proof on JJO. The special master found it significant that JJO relied on in-house counsel instead

Case 1:98-cv-00019-SLR    Document 207-2    Filed 05/19/2005    Page 20 of 32

Not Reported in F.Supp.                                                    Page 18
(Cite as: 1991 WL 340579, *15 (D.Minn.))

of obtaining a timely opinion of outside counsel, but, contrary to JJO, this was an entirely proper consideration as one factor in willfulness. *See Studiengesellschaft Kohle v. Dart Indus., Inc.,* 862 F.2d 1564, 1579 (Fed.Cir.1988) ("Whether a potential infringer obtains counsel's advice may be an important consideration...."). Finally, JJO's argument that conduct prior to the issuance of the patent is irrelevant to willfulness has been considered and rejected by the Federal Circuit. *See Kaufman Co. v. Lantech, Inc.,* 807 F.2d 970, 978-79 (Fed.Cir.1986) ("totality of the circumstances" includes conduct prior to issuance of patent). Evidence of JJO's misappropriation of 3M's trade secret is properly considered with respect to the Scholz patent.

## VI. DAMAGES

### A. *Multiple Damages*

"When increased damages are awarded under 35 U.S.C. § 284, the measure of those damages is committed to the district court's discretion, the exercise of which will not be overturned absent a clear showing of abuse." *Spindelfabrik Suessen-Schurr Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft,* 829 F.2d 1075, 1083-84 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1063 (1988). The issue here is whether the special master abused her discretion in awarding double damages to 3M for JJO's willful infringement.

The special master found that JJO willfully infringed the Reed patent in disregarding 3M's patent rights and ignoring its own knowledge of the patent's validity (CL 59). She also found that JJO willfully infringed the Scholz patents by using stolen material to copy the invention, ignoring 3M's patent rights, and taking litigation-driven positions without any reasonable basis upon which to challenge the patent (CL 60). She found that JJO had a well-established practice of competing with 3M by copying 3M inventions, ignoring the corresponding patents, and then attempting to minimize the invention (memorandum opinion at 37). Under the totality of these circumstances, and in an exercise of discretion informed by her familiarity with the matter in litigation, she concluded:

*16 Under the facts of this case, particularly the willful infringement predicated on misappropriation of trade secrets, it would be derelict for the Court to fail to multiply damages. The Court believes that it is appropriate to award 3M double damages. This award takes into account both the fact that JJO did not willfully infringe the Garwood patent, and that JJO's conduct with regards to the Scholz patents was particularly egregious.
*Id.* at 37-38 (footnote omitted).

JJO argues that this conclusion was erroneous and that it is no less than a violation of its first amendment right of access to the courts to multiply damages against it here.

Upon learning of a patent or the filing of suit, a potentially infringing party may exercise due care by continuing to manufacture and presenting what in good faith it believes to be legitimate defenses without risk that on that basis alone it will be found a willful infringer. *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.,* 897 F.2d 508, 511 (Fed.Cir.1990). However, "[a]n alleged infringer who intentionally blinds himself to the facts and law, continues to infringe, and employs the judicial process with no solidly-based expectation of success, can hardly be surprised when his infringement is found to have been willful." *Kloster Speedsteel AB v. Crucible, Inc.,* 793 F.2d 1565, 1580 n. 11 (Fed.Cir.1986). In the present case, JJO's conduct warranted the award of double damages. The special master did not abuse her discretion in multiplying the award of damages for willfulness.

JJO's first amendment argument argument is misplaced in light of the finding of willfulness. JJO contends that under the facts as found by the special master, the decision to multiply damages for seeking adjudication on infringement and validity is a violation of its right of access to the courts. It argues that as a civil litigant, it has a constitutional right to be free from penalty since it had a reasonable basis in fact for litigating, citing *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 744-45 (1983), and *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972). JJO would apply these cases to patent law in support of its position that when the questions of validity or infringement are close, increased damages for willfulness should not be awarded.

JJO is correct that the right of access to the courts is protected by the first amendment. *Bill Johnson's Restaurants, supra,* 461 U.S. at 741. This right is not implicated, however, when a suit is brought as a "mere sham" to cloak improper purposes. *Id.* In the patent context, a patentee's suit to enforce its patents may be sham litigation if the patentee has actual knowledge that its patents in suit are invalid before bringing suit.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1991 WL 340579, *16 (D.Minn.))

Page 19

*See Argus Chemical Corp. v. Fibre Glass-Evercoat Co.,* 812 F.2d 1381, 1386 (Fed.Cir.1987). The right to bring a suit to enforce one's patent is not equivalent to the right to infringe another's patent while waiting for the patentee to bring suit and then counterclaiming for invalidity. There are presumptions that patents are valid and that patent enforcement suits are brought in good faith. *See* 35 U.S.C. § 271(d); *Carpet Seaming Tape Licensing Corp. v. Best Seam, Inc.,* 616 F.2d 1133 (9th Cir.1980). This presumption does not apply to JJO's counterclaim for patent invalidity; indeed, the presumption runs in favor of 3M. JJO's reliance on patent invalidity while infringing was not protected by the first amendment, even if JJO later sought access to the courts by filing its counterclaims. Moreover, willful infringement encompasses a broader range of conduct than the infringer's intent in seeking a judicial determination of patent validity. Willfulness is a finding of fact, determined under the totality of the circumstances of the case. *Kloster Speedsteel, supra,* 793 F.2d at 1579. The special master found extensive support in the record for her finding of willfulness (*see* FF 346-372, Mem.Op. at 32-38). She doubled the damage award not because JJO had sought access to the courts, but because JJO "ignored known facts that contradicted its theories of invalidity and unenforceability" and undertook "conduct with regards to the Scholz patents [that] was particularly egregious," including its conduct with regard to the stolen Stegora samples of 3M's product. Mem.Op. at 37-38. This is not conduct protected by the first amendment.

**\*17** JJO has long been on notice of the law providing for multiplied damages upon a finding of willful infringement. That law was properly applied here. JJO is not being penalized for resorting to the courts in violation of its first amendment rights, but for the totality of its conduct under well-recognized patent law standards.

### B. *Compensatory damages*

The amount of the prevailing party's damages is a finding of fact, not reviewable here. *See Smithkline Diagnostics, Inc. v. Helena Laboratories Corp., supra,* 926 F.2d at 1164. "However, certain subsidiary decisions underlying a damage theory are discretionary with the court, such as, the choice of an accounting method for determining profit margin, ... or the methodology for arriving at a reasonable royalty...." *Id.* (cites omitted). These decisions are reviewed under an abuse of discretion standard. *Id.*

JJO argues that the special master abused her discretion in several of her subsidiary decisions. According to JJO, she made computational errors in calculating what it would have cost 3M to have produced its additional product had JJO not been infringing, in calculating the amount by which 3M could have raised its prices in a market without JJO's infringement, and in calculating the market share 3M would have then obtained. The special master clearly stated her reasons for these decisions in her findings of fact (*see* FF 386-91, 403-30, 378), however, and it cannot be said on the basis of the record that these decisions were an abuse of discretion.

JJO also argues that in determining lost profits damages, the special master misapplied the legal standards in failing to consider all market forces on the issue of whether substitutes would have been available but for the infringement, and in requiring JJO to affirmatively establish the presence of an acceptable non-infringing substitute.

JJO has taken one sentence from the special master's report out of context and used it as an occasion to reargue the facts here under the pretense of showing an abuse of discretion. The special master wrote: "There is no evidence in the record suggesting that JJO could have actually purchased a competitive casting tape from Bayer during the infringement period." (FF 380) According to JJO, this shows that the special master put the burden on JJO to affirmatively prove acceptable non-infringing substitutes in the market, violating the legal standard which puts the burden of proving the absence of such substitutes on the plaintiff. *See State Indus., Inc. v. Mor-Flo Indus., Inc.,* 883 F.2d 1573, 1577 (Fed.Cir.1989), *cert. denied,* 110 S.Ct. 725 (1990). While JJO has cited the correct legal standard, it has misquoted the special master. A complete reading of her findings shows that she properly applied this standard. For example, she found: "JJO's own testing shows that the Bayer-made product was unacceptable to JJO." (FF 380) She found that it was JJO's own conclusion at the time that Bayer could not supply it with an acceptable competitive substitute. It was in this context that she stated that the record was devoid of evidence that JJO could have actually purchased such a substitute--i.e., she found that JJO's own position during the infringement period provided 3M with the support it needed to show that there were no acceptable noninfringing substitutes. The special master properly applied the law.

### VII. INJUNCTIVE RELIEF

### A. *Stay of Injunction*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*18 The special master determined pursuant to 35 U.S.C. § 283 that an injunction should issue enjoining JJO from further infringement and submitted a draft injunction to the court.   3M has submitted proposed changes to this draft injunction.   JJO objects to certain details of the draft injunction and has moved for a stay of injunction pending appeal. [FN6]

This court has discretion to grant a stay of injunction upon consideration of all the circumstances, including: (1) the likelihood of success on the merits of the appeal;  (2) the irreparable injury suffered absent a stay;  (3) whether substantial harm will come to other interested parties;  and (4) whether a stay will do harm to the public interest.   See E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co., 835 F.2d 277 (Fed.Cir.1987).   JJO argues that all four factors weigh in favor of granting a stay.   It argues that it has a strong likelihood of success on appeal, particularly with regard to the Scholz patents.   It contends that an injunction now may well result in it leaving the casting business altogether, putting some 180 persons out of work in Puerto Rico.   It argues that a stay will not harm 3M since 3M has shown its ability to compete with JJO even assuming JJO's products have been infringing.   Finally, JJO contends that an injunction now would have an undue chilling effect on those who contest issued patents, that the record is not clear that 3M can meet the market demand in JJO's absence, and that 3M has made it clear it intends to raise its prices to monopoly levels once JJO has exited the market--all factors harming the public interest.

JJO's arguments are unpersuasive.   First, the court has concluded that JJO is not successful on the merits, and it has not been persuaded that JJO is likely to prevail on appeal.   Second, the law presumes that 3M is irreparably harmed.

   In matters involving patent rights, irreparable harm has been presumed when a clear showing has been made of patent validity and infringement....   This presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm.

Richardson v. Suzuki Motor Co., 868 F.2d 1226, 1247 (Fed.Cir.) (cite omitted), cert. denied, 110 S.Ct. 154 (1989).   Here the special master found that 3M has already been harmed to the tune of more than $50 million by JJO's infringement.   Third, having built its fiberglass casting business on repeated infringement of 3M patents, JJO is in no position to complain that it might now have to leave the business if the injunction is granted.   Finally, the record shows that 3M can meet

market demand in JJO's absence (FF 374, memorandum opinion at 39);   the special master dismissed JJO's antitrust counterclaim, to which JJO has not objected;  and an injunction is appropriate to "chill" willfully infringing conduct.       Upon consideration of all the relevant factors, JJO's motion for a stay of injunction should be denied.

B. Scope of Injunction

*19 3M has proposed three changes to the order for judgment drafted by the special master.   3M proposes replacing paragraph 9 (enjoining JJO from infringing the claims of the patents in suit) with a new paragraph specifying in detail the patents' claims which are not to be infringed and the particular JJO products which were found to be infringing.   3M would add a new paragraph 10 to specify the form of the notice which JJO would be required to provide regarding the injunction and require that it be sent to JJO's distributors, employees, etc.   Finally, 3M would add a new paragraph 16 providing that this court would reserve jurisdiction to receive evidence concerning 3M's damages between April 30, 1991, the date of the special master's report, and the date the injunction is issued.

JJO objects to two of 3M's proposed changes.   JJO argues that 3M's proposed paragraph 9 is overbroad in that it enjoins U-Thane products generally, expressly "including" its Green Label U-Thane product, but not excluding its Blue Label U-Thane product which was not a part of this case.   JJO contends that it cannot tell from the special master's report or 3M's proposed order whether it would be risking contempt if it were to introduce other products containing U-Thane.   JJO also objects to 3M's proposed new paragraph 10 enjoining distributors from selling existing stocks of its products.   According to JJO, 3M has already been compensated in damages for these products since they were already booked as sales by JJO and included in the special master's computation of lost profits damages;  enjoining their sale would thus give 3M a double recovery.

Fed.R.Civ.P. 65(d) provides that injunctions be specific in terms, describe in reasonable detail the acts sought to be restrained, and be binding only upon the parties and "those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."   See KSM Fastening Systems, Inc. v. H.A. Jones Co., 776 F.2d 1522, 1525 (Fed.Cir.1985).   Contempt proceedings "are available only with respect to devices previously

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

admitted or adjudged to infringe, and to other devices which are no more than colorably different therefrom and which clearly are infringements of the patent." *Id.* at 1526.    Even where the injunction is written narrowly against a particular infringing device, however, contempt could be found on the basis of a modified infringing device "where it is evident that the modifications do not avoid infringement and were made for the purpose of evasion of the court's order." *Id.* The standard is whether the differences between the specifically enjoined and the modified devices are "merely colorable." *Id.*

It would appear that the changes suggested by 3M to paragraph 9 of the master's draft order for judgment fit within these principles. 3M's revisions would specify the products found to be infringing and the claims which they infringe. It would also specify who is restrained as "persons in active concert" with JJO. 3M has not included Blue Label with U-Thane in the injunction. Although JJO expresses concern that the injunction might be read as enjoining its manufacture or sale, or the manufacture or sale of other products with U-Thane besides Green Label, this is not what the injunction says. Any alleged violation of the injunction with other U-Thane products would be judged by the principles enunciated in *KSM Fasteners, supra.* 3M's suggested new paragraph 10 should be rejected, however. 3M should not benefit from injunctive relief covering JJO products for which it has already been compensated (doubly) in damages. The injunction drafted by the special master is sufficiently specific in its notice provisions. JJO has not objected to 3M's suggestion that the order include a provision to account for damages between April 30, 1991, and the date of issuance of an injunction. This suggestion should be incorporated.

ORDER FOR JUDGMENT

*20 Based upon all the files, records, and proceedings herein, the findings of fact contained within the report of Special Master Janice M. Symchych, and the conclusions of law contained within this court's memorandum opinion, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1. United States Patent No. 4,502,479 (Garwood) is valid and enforceable. The counterclaim of Johnson & Johnson Orthopaedics for a declaratory judgment that said patent is invalid and unenforceable is dismissed with prejudice;

2. United States Patent No. 4,609,578 (Reed) is valid and enforceable. The counterclaim of Johnson &

Johnson Orthopaedics for a declaratory judgment that said patent is invalid and unenforceable is dismissed with prejudice;

3. United States Patent No. 4,667,661 (Scholz I) is valid and enforceable. The counterclaim of Johnson & Johnson Orthopaedics for a declaratory judgment that said patent is invalid and unenforceable is dismissed with prejudice;

4. United States Patent No. 4,774,937 (Scholz II) is valid and enforceable. The counterclaim of Johnson & Johnson Orthopaedics for a declaratory judgment that said patent is invalid and unenforceable is dismissed with prejudice;

5. Defendant Johnson & Johnson Orthopaedics has infringed the claims of the above-listed patents, and is liable in damages to plaintiff Minnesota Mining and Manufacturing for said infringement in the amount of $53,636,348;

6. Plaintiff is entitled to an award of prejudgment interest in the amount of $9,525,000;

7. Defendant willfully infringed United States Patent Nos. 4,609,578, 4,667,661, and 4,774,937. The damages assessed against defendant (paragraph 5) shall be doubled, exclusive of prejudgment interest;

8. Plaintiff shall recover from defendant money damages in the sum of $106,797,696.00.

9. Defendant Johnson & Johnson Orthopaedics and its officers, agents, servants, employees and those persons in active concert with them who receive notice of this injunction are hereby immediately permanently enjoined from directly infringing, contributorily infringing, and/or actively inducing the infringement of claims 1-4, and 8 of the Garwood ('479) patent, claim 1 of the Reed ('578) patent, claims 12 and 17 or the Scholz I ('661) patent, and claims 3, 4, 10, 11, 12, 18, 21, and 43 of the Scholz II ('937) patent, including, but not limited to, the further manufacture, use, or sale of infringing products, including:

a. for Garwood:
  Improved Delta Lite Fiberglass casting tape (Improved Red Label) (heat set and zone coated versions not including products using K-264 substrate);
  Delta-Lite "S" casting tape (Green Label) and colored versions thereof (not including products using K-264 substrate); and

Delta-Lite Fiberglass Reinforcing Strip

b. for Reed:
Improved Delta-Lite Fiberglass casting tape (Improved Red Label) (heat set versions only); and
Delta-Lite "S" casting tape (Green Label) and colored versions thereof (heat set versions only)

c. for Scholz I and II:
*21 S-Thane products, including:
Delta-Lite "S" casting tape (Green Label) and colored versions thereof; and
Delta-Lite Conformable casting tape (Blue Label) and colored versions thereof
U-Thane products, including:
Delta-Lite "S" casting tape (Green label) and colored versions thereof; and
Delta-Lite Fiberglass Reinforcing Strip.

10. Defendant Johnson & Johnson Orthopaedics shall forthwith provide written notice of this injunction to its officers, agents, servants, employees and those persons in active concert with them;

11. Defendant has violated Minn.Stat. § 325C *et seq.* by misappropriating plaintiff's trade secret. In the event that defendant is ultimately determined not to be liable in damages to plaintiff for infringement of the Scholz patents, then defendant shall be liable to plaintiff in the amount of $500,000 for damages caused by its violation of Minn.Stat. § 325C *et seq.;*

12. Plaintiff's claims based on Minn.Stat. §§ 609.52(8) and 609.53 are dismissed with prejudice;

13. Defendant's counterclaims based on 15 U.S.C. §§ 2, 15, and 26, as well as defendant's counterclaims under Minnesota law for fraud and violation of the Uniform Deceptive Trade Practices Act, are dismissed with prejudice;

14. Plaintiff shall not recover attorney fees;

15. This order shall be deemed final for purposes of entry of judgment although the court reserves jurisdiction to receive evidence relative to damages to which 3M may be entitled for the period between April 30, 1991 and today's date.

LET JUDGMENT BE ENTERED ACCORDINGLY.

FN1. JJO has also moved for leave to submit a reply to 3M's opposition to JJO's Response

to the Report of the Special Master and to 3M's Opposition to JJO's Motion for a Limited Remand or, in the Alternative, for a Stay. Under all the circumstances, this motion should be granted and the replies have been considered.

FN2. Fact issues are listed only because raised by JJO.

FN3. JJO argues that the Scholz patents are invalid as anticipated because certain prior art patents and commercial products meet its standards for KCOF. This point relates more to indefiniteness and it will be discussed later. Moreover, in light of the construction of the Scholz claims, the special master's finding of fact that the Scholz patents are not anticipated should be regarded as final here.

FN4. Even if it were argued that 3M should have discovered by reasonable diligence that JJO had acquired its trade secret in late 1985 or early 1986, the statute of limitations would then be equitably tolled. Under Minnesota law, fraudulent concealment tolls the statute of limitations if it is the very existence of the facts which establish the cause of action which are fraudulently concealed. *Hydra-Mac, Inc. v. Onan Corp.,* 450 N.W.2d 913, 919 (Minn.1990). Here Hull's testimony concealed JJO's knowledge of the secret formula and its use.

FN5. Blue Label with U-Thane is apparently not currently marketed by JJO. *See* JJO's reply memorandum in support of objections at 1-4; Porcelli letter to court dated July 1, 1991. The injunction proposed by 3M does not enjoin Blue Label with U-Thane by name, but would enjoin "U-Thane products, including ... Green Label...." JJO argues that this should be more definite; that it should not even impliedly enjoin Blue Label with U-Thane since that product was not found to infringe (assuming that its inclusion in CL 19-20 was inadvertent or otherwise mistaken).

FN6. In addition to a motion for stay of injunction, JJO has moved for a limited remand to reopen the issue of whether the Scholz test for KCOF was adequately conducted with regard to its U-Thane products. JJO has not shown that it was denied an opportunity to present the evidence at trial that it now seeks to present on remand, nor has it shown that the evidence actually presented at trial was fraudulent or inadmissible. Under these circumstances, this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
**(Cite as: 1991 WL 340579, \*21 (D.Minn.))**

motion should be denied.

1991 WL 340579 (D.Minn.), 22 U.S.P.Q.2d 1401

Motions, Pleadings and Filings (Back to top)

.              4:86CV00359              (Docket)
(Apr. 28, 1986)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

22 U.S.P.Q.2d 1551
1991 WL 337357 (N.D.Ga.), 22 U.S.P.Q.2d 1551
**(Cite as: 22 U.S.P.Q.2d 1551)**

**H**

B & H Manufacturing Inc.
v.
Owens-Illinois Glass Container Inc.

District Court, N.D. Georgia

Nos. 1:88-cv-2077-GET and 1:90-cv-2670-GET

Decided July 5, 1991
United States Patents Quarterly Headnotes

JUDICIAL PRACTICE AND PROCEDURE
[1] Procedure -- Stays -- In general (Section 410.2901)

REMEDIES
Non-monetary and injunctive -- Equitable relief --
Permanent injunctions -- Patents (Section 505.0709.07)
  Permanent injunction against defendant's use of
infringing bottle-labeling process is warranted, since
defendant has failed to rebut presumption of
irreparable harm arising from finding of validity and
infringement, since monetary damages would not
compensate plaintiff for defendant's violation of its
right to exclude others from using patented process,
since any harm to defendant caused by having to
change processes on short notice does not outweigh
harm to plaintiff if injunction does not issue, and since
public policy supports issuance of such relief; stay of
injunction pending appeal is not warranted, despite
defendant's assertion that parties are not competitors in
that plaintiff sells bottle-labeling technology and
defendant labels bottles, since parties are, in certain
markets, competitors.

REMEDIES
Particular patents - Chemical - Heat shrinkable film
  4,704,173, Hoffman, system for applying heat shrink
film to containers and other articles and heat shrinking
the same, permanent injunction issued.
  4,844,957, Hoffman, system for applying heat shrink
film to containers and other articles and heat shrinking
the same, permanent injunction issued.

  *1552 Consolidated actions by B & H Manufacturing
Inc. against Owens-Illinois Glass Container Inc. for
patent infringement, and by Owens-Illinois Glass
Container Inc., against B & H Manufacturing Inc. for
declaration of patent non-infringement. On plaintiff's
motion for permanent injunction following jury verdict
and award of damages, and on defendant's application
for stay if injunction is granted. Plaintiff's motion
granted; defendant's application for stay denied.

Related decisions: 14 USPQ2d 1896 ; 13 USPQ2d
2061 .

  Ernie L. Brooks, Kevin J.Heinl, and Thomas A.
Lewry, of Brooks & Kushman, Southfield, Mich., for
plaintiffs.

  Albert S. Anderson, of Jones, Askew & Lunsford,
Atlanta, Ga.; E.A. Simpson, of Powell, Goldstein,
Frazer & Murphy, Atlanta, for defendants.

  Tidwell, J.

  The above-styled matter is before the court on B & H
Manufacturing Inc.'s   ("B & H") motion for a
permanent injunction.

  B & H filed suit against Owens-Illinois Glass
Container, Inc. ("O-I") alleging that O-I's bottle-
labeling process infringed two of B & H's patents. On
April 29, 1991, a jury returned a verdict in B & H's
favor and awarded B & H $36,485,400.00 in damages.

  In the instant motion, B & H seeks a permanent
injunction enjoining O-I from future infringement of
the patents-in-suit pursuant to 35 U.S.C. Section 283
which provides:

  The several courts having jurisdiction of cases under
this title may grant injunctions in accordance with the
principles of equity to prevent the violation of any right
secured by a patent, on such terms as the court deems
reasonable.

  To determine whether an injunction should issue in
patent cases, courts rely on standard equity analysis.
*See Roche Products v. Bolar Pharmaceutical Co.*, 733
F.2d 858, 866 [ 221 USPQ 937 ] (Fed. Cir. 1984). The
court determines, and the parties agree, that the
following four factors should be considered in
determining whether B & H's injunction should be
granted: (1) whether B & H will be irreparably injured
if the injunction does not issue, (2) whether B & H has
an adequate remedy at law for monetary damages, (3)
who would be more harmed by the issuance or denial
of the injunction, and (4) whether granting the
injunction would serve any public interest. *See Smith
International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573,
1578-79 [ 219 USPQ 686 ] (Fed. Cir. 1983).

  First, B & H has established that it will be irreparably

injured if the injunction does not issue. Once the "validity [of the patent] and infringement have been clearly established, immediate irreparable injury is presumed."*See Smith,* 718 F.2d at 1581. O-I has not adequately rebutted this presumption.

Second, B & H has established that it does not have an adequate remedy at law because, as the court in *Smith* recognized, "the very nature of the patent right is the right to exclude others." 718 F.2d at 1581. Monetary damages, therefore, would not compensate B & H for O-I's violation of B & H's right to exclude others from using its patented processes. *See Shiley, Inc. v. Bentley Laboratories, Inc.,* 601 F. Supp. 964, 970 [ 225 USPQ 1013 ] (C.D. Calif. 1985) *affirmed* 794 F.2d 1561 [ 230 USPQ 112 ] (Fed. Cir. 1986) ("In a patent infringement case, where the infringing device will continue to infringe and thus damage [patent owner] in the future, monetary damages are generally considered inadequate."). In response, O-I merely contends that since B & H has licensed its bottle-labeling technology to others, B & H **\*1553** has no "desire" to exclude others from using its process.

Third, the court determines that the harm to B & H would be greater if the injunction was denied that the harm to O-I if the injunction was granted. As the court determined above, the essence of B & H's patent rights is the ability of B & H to exclude others from using its patented processes. This right, in fact, is so significantly important that, as determined above, monetary damages will not adequately compensate B & H for the continued infringement of its patents. O-I's contends that if the injunction is granted and it is required to stop using its infringing bottle-labeling process, it will be monetarily harmed by having to change processes on such short notice. On balance, this monetary injury to O-I is not as great as the injury B & H will suffer if the injunction does not issue.

Finally, public policy considerations dictate that the injunction issue. In *Smith,* the court held:

The very nature of patent rights is the right to exclude others. Once the patentee's patents have been held to be valid and infringed, he should be entitled to full enjoyment and protection of his patent rights. The infringer should not be allowed to continue his infringement in the face of such a holding. A court should not be reluctant to use its equity powers once a party has so clearly established his patent rights. . . . *To hold otherwise would be contrary to the public policy underlying the patent laws.* (emphasis supplied by court). 718 F.2d at 1581.

O-I's arguments in response to this fourth factor are unconvincing.

[1] Based on the foregoing, the court determines that B & H is entitled to a permanent injunction.

In opposing B & H's motion, O-I contends that if the injunction should issue, the injunction should be stayed pending the appeal.

To stay the injunction pending the appeal, O-I must establish (1) that it is likely to prevail on appeal, (2) that it will be irreparably injured if the stay is not granted, (3) that the stay will not "substantially injure other parties interested in the proceedings," and (4) where the public interest lies. *See Standard Havens Products v. Gencor Industries,* 897 F.2d 511, 512 [ 13 USPQ2d 2029 ] (Fed. Cir. 1990).

O-I is not entitled to a stay pending the appeal based upon the reasoning set forth above.

The only other argument that O-I asserts in support of its request is that it is entitled to a stay because B & H and O-I are not competitors: B & H sells bottle-labeling technology and O-I labels bottles. The court finds this argument unconvincing because, in certain markets, B & H and O-I are competitors.

Finally, O-I does not address the other three factors described above.

Accordingly, O-I is not entitled to a stay pending the appeal and the application for stay is DENIED.

O-I requests that the injunction not prevent it "from disposing of any other bottles still in inventory but labeled in prior years, as well as the 10,134,264 gross of bottles labeled in 1991" because the jury damage award included these bottles. B & H has not responded to this argument. Accordingly, for good cause shown and pursuant to Local Rule 220-1(b)(1), O-I's request to exempt from the permanent injunction the bottles still in its inventory but labeled in prior years, as well as the 10,134,264 gross of bottles labeled in 1991 and prior to the jury verdict in this case is GRANTED.

The defendant has also requested that the court allow some time for the defendant to cease the operations that will be affected by the provisions of the injunction.

The court has determined to deny this request for the following reasons:

1. The defendant has already had the period of time since the verdict in this matter to anticipate and make whatever arrangements were necessary in order to comply with the terms of this order.

2. Based upon this court's observations of the conduct of the defendant, this court is far from convinced that the defendant has acted fairly or reasonably or responsibly in preparing for the effects of this order.

3. The defendant has failed to suggest or offer fair or reasonable safeguards or compensations to the plaintiff in order to secure the requested delay.

Based upon the foregoing, the provisions of this order shall be effective immediately.

Owens-Illinois Glass Container, Inc. (a/k/a Owens-Brockway Glass Container, Inc.) ("O-I"), its officers, agents, attorneys, servants and employees, and those persons in active concert or participation with them are hereby ENJOINED during the life of U.S. Patent Nos. 4,704,173 and 4,844,957 (the '173 patent and '957 patent):

(1) from using any process, or inducing the use of any process, which infringes claim 9 of the '173 patent, including specifically the WSL process covered by the proofs at trial;

(2) from manufacturing, or inducing the manufacture, of any products which *1554 infringe claim 8 of the '957 patent, including specifically bottles made using the WSL process covered by the proofs at trial; and

(3) from selling, or inducing the sale of, bottles labeled after April 29, 1991 which infringe claim 8 of the '957 patent, including specifically such bottles made using the WSL process covered by the proofs at trial.

SO ORDERED.

N.D.Ga.

22 U.S.P.Q.2d 1551

END OF DOCUMENT

COPR. © 2005 The Bureau of National Affairs, Inc.

# EXHIBIT D

Not Reported in F.Supp.
1991 WL 333701 (E.D.Va.)
(Cite as: 1991 WL 333701 (E.D.Va.))

**H**

Only the Westlaw citation is currently available.

United States District Court, E.D. Virginia,
Alexandria Division.
WANG LABORATORIES, INC., Plaintiff,
v.
TOSHIBA CORP., et al., Defendants,
and
MOLEX INC., Defendant-Intervenor.
Civ. No. 90-1477-A.

Aug. 23, 1991.

*ORDER STAYING EXECUTION OF JUDGMENT*

ELLIS, District Judge.

**\*1** Before the Court is the NEC Defendants' Motion for Stay of the Injunction Pending Disposition of Defendants' Post-Trial Motions for Judgment and Pending Appeal.

By separate orders issued this day judgment in the form of damages and also an injunction enjoining future infringement is being entered against the defendants.

Pursuant to Rule 62(a), there is no automatic stay of a final judgment in an action for an injunction "[u]nless otherwise ordered by the court." Pursuant to Rule 62(c), Fed.R.Civ.P., a court "in its discretion may suspend ... an injunction during the pendency of [an] appeal upon such terms as to bond or otherwise as it deems proper...." [FN1] Hence, the Court has discretion to stay the judgment and injunction pending consideration of post-judgment motions and pending appeal.

The Federal Circuit has observed that in deciding whether to stay an injunction enjoining infringement of patents, a court must consider

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Standard Havens Products, Inc. v. Gecor Industries, Inc.,* 897 F.2d 511, 512 (Fed.Cir.1990). For the reasons stated from the bench and in this Order, the Court finds that consideration of these factors supports issuing a stay of the injunction pending consideration of post-trial motions and also pending appeal. In particular, the Court notes that Wang does not manufacture the patented invention itself and has not represented that it has attempted to exclude others from manufacturing it. Hence, any harm to Wang from staying the injunction is less and "and of a different nature than harm to a patentee who is practicing its invention and fully excluding others." *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.,* 835 F.2d 277, 278 (Fed.Cir.1987); *see also Standard Havens Products v. Gencor Industries, Inc.,* 897 F.2d at 514 (noting that fact that harm to nonmovant was minimal was "nearly dispositive" in Federal Circuit's reasoning in *Dupont*). The Court further finds that the legal issues to be considered in post-trial motions and on any appeal are substantial, and further finds evidence of substantial harm to the defendants, who will be confronted with a choice of either ceasing their substantial use and sale of infringing products or agreeing to a license which would entail an end to their challenge to the patents.

For these reasons and those stated from the bench, the motion to stay the judgment and injunction pending post-trial motions and pending appeal should be, and hereby is, GRANTED. But this grant is with leave to the plaintiff's to renew their objection to the stay of the injunction at the conclusion of the Court's consideration of post-trial motions.

**\*2** As security for the nonmovant's rights, the Court further ORDERS that Toshiba post a bond or corporate suretyship of $10 million and NEC post a bond or corporate suretyship of $6 million dollars.

The Clerk is directed to send copies of this Order to all counsel of record.

FN1. Rule 62(c) has been interpreted as permitting consideration of a request to suspend an injunction pending appeal either prior to the filing of such an appeal, when there is reason to believe that an appeal will be taken, or after filing of the appeal, even though after the taking of the appeal the district court no longer has jurisdiction over the case. *See* C. Wright & A. Miller, *Federal Practice and Procedure,* § 2905 at 324 (1973)
.

1991 WL 333701 (E.D.Va.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
**(Cite as: 1991 WL 333701, \*2 (E.D.Va.))**

END OF DOCUMENT